[No. A039937. First Dist., Div. One. Jan. 20, 1989.]

CATHAY MORTUARY, INC., Plaintiff and Appellant, v.
SAN FRANCISCO PLANNING COMMISSION et al., Defendants
and Respondents;
NICHOLAS DAPHNE et al., Real Parties in Interest.

COUNSEL

James J. Reilly and Paul J. Slavit for Plaintiff and Appellant and for Real Parties in Interest.

Louise H. Renne, City Attorney, Judith A. Boyajian and Melba Yee, Deputy City Attorneys, for Defendants and Respondents.

OPINION

NEWSOM, J.—The City and County of San Francisco proposes to acquire by eminent domain the property of Cathay Mortuary, Inc., for development of a park. In its environmental review of the project, the Department of City Planning issued a negative declaration with respect to the need for an environmental impact report. The owners of the Cathay Mortuary, Nicholas and Virginia Daphne (hereafter real parties), appealed the decision to the San Francisco Planning Commission (hereafter Planning Commission) which affirmed the decision to issue the negative declaration. Real parties then filed a petition for a writ of mandate ordering the Planning Commission to prepare an environmental impact report. They now appeal from the judgment of the trial court filed August 20, 1987, denying the petition.

Real parties have operated a funeral parlor, known as Cathay Mortuary, on the corner of Jackson and Powell Streets in San Francisco's Chinatown for over 40 years. The mortuary has specialized in traditional Chinese funerals, involving a procession behind a hearse bearing a memorial picture of the deceased along the streets where the deceased once lived and worked. It is the only funeral parlor in the heart of Chinatown offering these services.

Among San Francisco neighborhoods, Chinatown stands in unique need of additional park space. The district today possesses only about two-tenths of an acre of park space per thousand population. The passage of Proposition J in 1974 provided a financing mechanism for the development of parks within high need neighborhoods. But the search for a suitable site within Chinatown has been difficult and protracted. The concerned agencies have sought property of sufficient size with a single owner, possessing relatively level topography and access to sunlight, that could be converted into a park without subtracting from the scarce supply of housing and parking. Few sites have met these criteria. In 1986, after 14 years of indecision, the board of supervisors finally approved the development of a park on the present site

of the Cathay Mortuary. Located on a corner within the core area of Chinatown, the site enjoys more sunlight than most properties in this congested area. The gently sloping terrain covers 13,420 square feet, a relatively large plot by Chinatown standards.

The selection of the site for a park has won widespread support within Chinatown, the larger Chinese community, and the entire city. But in opposing the use of their property as a park, real parties have also gained the sympathy of a substantial constituency. No fewer than 600 people, mostly from within Chinatown, have signed a petition to allow the Cathay Mortuary to remain in its present location. The record contains several eloquent letters written on the real parties' behalf.

Under the California Environmental Quality Act (CEQA), all local agencies must prepare an environmental impact report (EIR) on projects that "may have a significant effect on the environment." (Pub. Res. Code, § 21151) The "environment" is defined to mean "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Res. Code, § 21060.5) ■ Whenever there is a possibility that a proposed project may have a significant environmental effect, the agency having principal responsibility for carrying out the project must conduct an initial threshold study. "If the initial study reveals that the project will not have such effect, the lead agency may complete a negative declaration briefly describing the reasons supporting this determination. [Citation.]" (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1000 [165 Cal.Rptr. 514], fn. deleted.) ■ In a writ of mandate proceeding challenging the adoption of such a negative declaration, the court reviews the administrative record to determine whether "it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].) The adoption of the negative declaration may be sustained only if no such "fair argument" can be made. (*Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988, 1002.)

It is paradoxical that real parties should attack the selection of their site on environmental grounds. The proposed park would bring many obvious environmental benefits—open space, vegetation, access to sunlight, and a reduction in traffic generated by funeral activities. Whether or not the selection of the site was wise, one might expect that the environmental effects would offer a relatively unpromising avenue to attack the

decision. ■ Nevertheless, real parties seek to invoke CEQA on several grounds.

First, real parties rely on California Code of Regulations, title 14, division 6, chapter 3, appendix G, which provides that a project "will normally have a significant effect on the environment if it will . . . (j) Disrupt . . . a property of . . . cultural significance to a community or ethnic or social group . . . ." Real parties argue that the traditional Chinese funeral is an event of cultural significance to the Chinatown community and that they have performed these services efficiently and with sensitivity to Chinese cultural values. But CEQA will come into play only if a disruption of the physical environment has cultural significance. Real parties must establish that the cultural traditions of the Chinese funeral are tied in some manner to this particular site. The record reveals only that the Cathay Mortuary is the most centrally located funeral parlor for Chinatown. At least four other mortuaries within San Francisco also offer traditional funerals. Another mortuary at the fringe of Chinatown "claims that approximately 95% of its business is with Chinese clients and of that percentage, 75% is for traditional Chinatown funerals." As the Chinese population has spread beyond Chinatown, Cathay Mortuary plays a diminishing role in maintaining Chinese funeral traditions. Real parties have shown only that removal of the Cathay Mortuary would work an inconvenience on some residents of the neighborhood; they have fallen short of making a fair argument that this particular property is of cultural significance to the community.

With less plausibility, real parties argue that the establishment of the park will "[c]onflict with established . . . religious . . . uses of the area . . . ." (Cal. Code Regs., tit. 14, div. 6, ch. 3, appen. G (w).) The presence of the mortuary on the property over the last 40 years, they assert, has caused it to become identified with the dead in the eyes of the Chinese community. As a consequence, most residents of the neighborhood are likely to avoid any park established on the property. Although their brief lacks precise citations to the record, the argument seems to be based chiefly on a brief suggestion of Reverend Ben Chin of the Twenty-First Avenue Baptist Chinese Service. A letter from another resident provides some additional support for the idea. But the negative declaration notes that "[o]ther sites within Chinatown that once contained mortuary uses now contain other types of uses that are patronized by the community." The widespread support for the park within the Chinatown community appears to belie the argument that residents will avoid the park. On this record, we think that real parties have failed to adduce substantial evidence to support their argument that the property has been effectively dedicated to the dead by the presence of the mortuary.

Next, real parties argue that the development of the park would "[d]isrupt or divide the physical arrangement of an established community . . . ." (Cal. Code Regs., tit. 14, div. 6, ch. 3, appen. G (u).) The strained logic of the argument is that since the mortuary has been an integral part of the social fabric of Chinatown, its physical removal to another location would be disruptive to the community. We believe, however, that this guideline was intended to apply to projects, such as highway construction, that would constitute physical barriers dividing a community. Under real parties' interpretation of the guideline, the removal of any important use within a community would have a significant environmental effect requiring preparation of an EIR.

Arguing that the park would have poor access to sunlight, real parties do touch on an issue that is environmental in nature. But CEQA requires preparation of an EIR to study "a substantial, or potentially substantial, *adverse change* in any of the physical conditions within the areas affected by the project . . . ." (Italics added.) (Cal. Code Regs., tit. 14, § 15382.) It is irrelevant whether other alternative sites would have better access to sunlight. The development of the park would result in a beneficial change, affording residents access to sunlight now barred by the presence of a building on the property.

Lastly, real parties allude in passing to the possibility that the development of the park will result in an increase in vandalism and in structural hazards to adjacent property. But they fail to provide citations to relevant portions of the record, and we have not discovered any substantial evidence in the record supporting the arguments.

Real parties seek to bolster these frail arguments by invoking certain general principles concerning the administration of CEQA that are now codified in California Code of Regulations, title 14, section 15064, subdivision (h): "In marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the lead agency shall be guided by the following factors: [¶] (1) If there is serious public controversy over the environmental effects of a project, the lead agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR. Controversy unrelated to an environmental issue does not require preparation of an EIR. [¶] (2) If there is a disagreement between experts over the significance of an effect on the environment, the lead agency shall treat the effect as significant and shall prepare an EIR."

Real parties contend that the substantial support they have received within Chinatown establishes a "serious public controversy," and they

point to the testimony of their consultants, Blayney-Dyett, as establishing a disagreement among experts. But the arguments fail to survive a close reading of the guidelines. The record falls far short of establishing a marginal case "where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment . . . ." (Cal. Code Regs., tit. 14, § 15064, subd. (h)) Moreover, while the selection of the property as a park site has indeed generated a serious public controversy, real parties have not shown that the controversy is related to any environmental issue. Similarly, if we concede Blayney-Dyett's status as experts in urban planning, their original study of alternative park sites was addressed to planning questions having only a tangential relation to environmental issues. Later attacking the proposed negative declaration, they raised a series of other objections that either again related to planning issues or exceeded the limits of their expertise as urban planners. Their testimony fails to establish a disagreement among experts "over the significance of an effect on the environment . . . ." (*Ibid.*)

The judgment is affirmed.

Racanelli, P. J., and Collins, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.