[No. A049133. First Dist., Div. Five. July 30, 1990.]

CITIZEN ACTION TO SERVE ALL STUDENTS et al., Plaintiffs and Appellants, v.
JOEL C. THORNLEY, as Superintendent of Schools, etc., et al., Defendants and Respondents.

**COUNSEL**

Morrison & Foerster, Arturo J. Gonzalez, Richard G. Seeborg, George A. Martinez and Aron Cramer for Plaintiffs and Appellants.

Liebert, Cassidy & Frierson, Nicholas T. Calderon and Jeffrey Sloan for Defendants and Respondents.

**OPINION**

**LOW, P. J.**—Appellant Citizen Action to Serve All Students (CASAS) is an ad hoc community organization opposed to the decision of respondent Hayward Unified School District Board of Education (Board) to close Sunset High School (Sunset). CASAS and four of its members appeal from an order denying a petition for writ of mandate which challenged the closure decision on the ground that it violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] The sole issue before us is whether the decision to close Sunset violates applicable environmental law. We do not and may not determine the wisdom of the decision. The order is affirmed.

---

[1] Statutory citations are to the Public Resources Code unless otherwise indicated.

## Procedural Background and Facts

The Hayward Unified School District (District) serves almost 19,000 students and operates 4 high schools, 4 intermediate schools, 23 elementary schools, various training and children's centers, and 2 adult education centers serving 16,000 people. In a report of over 100 pages plus appendices, completed in March 1988, respondent Joel Thornley informed the Board that high school enrollment had dramatically decreased while enrollment at the elementary and intermediate levels had increased and was projected to continue increasing in the future. While the four high schools were underutilized, and had not operated at their full capacity of 2,000 students each since 1968, the District's intermediate schools would not be able to accommodate the projected growth.

After considering several options for the reconfiguration of the school system, the Board approved the closing of Sunset and the reassignment of its students and staff to the remaining three facilities. In connection with this closure plan, the Board subsequently approved a plan to move to Sunset the District's adult education center at Rancho Arroyo, and reopen the latter facility as a fifth intermediate school. The relocated adult education center would become one component of a projected community center at the Sunset site, which would also include a migrant education program, a community health center, a branch city library, a child-care program, a training program for licensed vocational nurses, a District employee "Wellness Center," and other community services including recreational activities and night high school football games. Respondents concluded that the closure plan will benefit the District and save over $1 million by the more efficient use of the remaining three schools.

On November 1, 1988, the Board voted to close Sunset. The decision brought considerable opposition in the neighboring community, as Sunset and its programs and staff enjoyed considerable respect. On January 9, 1989, appellants filed their initial complaint against respondents. This complaint alleged three causes of action: (1) that the closure violated equal protection because Sunset serves primarily low-income students; (2) that the closure violated California requirements for bilingual education; and (3) that the closure decision was "irrational [and] discriminatory" and therefore "an abuse of discretion in violation of California Code of Civil Procedure section 1084 et seq." The complaint sought injunctive relief and a writ of mandate with regard to the third cause of action.

On June 16, 1989, the trial court granted appellants' motion for leave to amend the complaint to state a mandamus cause of action under CEQA.

The second amended complaint alleged that the school closure would have a significant effect on the environment and that respondents had failed to "conduct any formal study to determine what the significant effects would be or whether anything could be done to mitigate those effects." Appellants alleged respondents had abused their discretion by violating the provisions of CEQA, and sought mandate "to keep Sunset High School open and its bilingual programs intact."

The trial court denied appellants all relief on their allegations unrelated to CEQA. However, on September 21, 1989, the trial court filed its "Decision on Hearing For Peremptory Writ of Mandate." The court found that "prior to making its decision on November 1, 1988, the . . . Board failed to comply with the California Environmental Quality Act [citation] in that it did not evaluate properly whether its decision was exempt" from CEQA. The court directed that a peremptory writ of mandate issue staying closure until the Board "evaluates properly whether its proposed action is exempt" from CEQA, and "whether, if not exempt, the action may have a significant effect on the environment; and whether, if the action has a significant effect on the environment, an environmental impact report is required." The court set a compliance date of December 21, 1989.

In response to this order, the Board declined to consider the closure exempt from CEQA. The District hired two consultants to study the environmental effects of the proposed closure plan. DKS Associates completed a traffic study which was incorporated into a "preliminary negative declaration" prepared by EIP Associates. Both studies concluded that closing Sunset would not cause significant environmental effects. The studies proposed mitigation measures to minimize the already insignificant impacts which the District agreed to adopt.

The Board accepted the studies' conclusion that the closure plan would pose no significant environmental effects. In November 1989 the Board notified the public of its intent to adopt a negative declaration.

Respondents received approximately 23 timely written appeals of their decision to adopt the negative declaration, mostly letters from concerned parents, and received a petition against closure signed by over 300 parents and neighborhood residents. The areas of concern included traffic congestion, parking, adverse social, economic and cultural impacts, student safety, and availability of mass transit for reassigned students.

After written responses to the appeals and a lengthy public hearing, the Board approved the negative declaration on December 18, 1989. The

requisite notice of determination of the approval (§ 21108) recites that the negative declaration was approved on the condition that mitigation measures would be adopted.

On December 20, 1989, respondents filed a "Return to Peremptory Writ of Mandamus" and accompanying points and authorities, in which they argued they had complied with CEQA by conducting environmental studies and adopting a legitimate negative declaration. Appellants filed an opposition, contending that the Board's adoption of the negative declaration was an abuse of discretion because there was substantial evidence that the project would significantly affect the environment. After briefing and consideration of the administrative record, the trial court denied appellants' mandate petition.

## DISCUSSION

By enacting CEQA "the Legislature sought to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.'" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66], quoting section 21001, subd. (d).) CEQA requires local agencies to prepare an EIR for any project which "may have a significant effect on the environment." (§ 21151; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 999 [165 Cal.Rptr. 514].) To implement the determination whether a given project might have such an effect and thus require an EIR, CEQA and its administrative guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. [hereafter Guidelines]) establish a "three-tiered structure." (*Friends of "B" Street, supra,* at p. 999.) If the project falls within a category which is exempt from CEQA or if it is certain not to have an environmental effect, "no further agency evaluation is required." (*Id.,* at p. 1000; see Guidelines, § 15061.) If the project is not exempt and if "there is a possibility that the project may have a significant environmental effect, the agency must conduct an initial threshold study. [Citation.] If the initial study reveals that the project will not have such effect, the . . . agency may complete a negative declaration . . . ." (*Friends of "B" Street, supra,* at p. 1000; see Guidelines, § 15070.) If the study reveals the project may have a significant environmental effect, an EIR must be prepared. (*No Oil, Inc.* v. *City of Los Angeles, supra,* at p. 74.)

The word "may" in this context connotes a reasonable possibility. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 83, fn. 16; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 309 [248 Cal.Rptr. 352].) "'Significant effect on the environment'" is defined as "a substantial,

or potentially substantial, adverse change in the environment." (§ 21068; see Guidelines, § 15382.)

■ The decision to adopt a negative declaration and dispense with an EIR is essentially a determination that a project will have no meaningful environmental effect; as appellants aptly point out, this decision has a "terminal effect on the environmental review process." (*Citizens of Lake Murray Area Assn.* v. *City Council* (1982) 129 Cal.App.3d 436, 440 [181 Cal.Rptr. 123].) Accordingly, CEQA demands a " 'low threshold requirement for preparation of an EIR.' " (*Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 310, quoting *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at p. 84.) An EIR is required if "it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc.* v. *City of Los Angeles, supra*, at p. 75.)

■ The standard of judicial review of an agency decision to adopt a negative declaration is whether there is substantial evidence in support of a "fair argument" of potential environmental impact. "If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it could be 'fairly argued' that the project might have a significant environmental impact." (*Friends of "B" Street* v. *City of Hayward, supra*, 106 Cal.App.3d at p. 1002.) The court does not merely inquire whether there is substantial evidence in the record to support the agency's decision of no significant impact; such a standard of review "nullifies the fair argument rule by upholding agency decisions that disregard fair arguments of environmental impact if they are supported by other [substantial] evidence in the record." (*Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 310, fn. 2.)

Appellants contend that the trial court applied the wrong standard of review by focusing only on whether there was substantial evidence to support the Board's determination of no significant impact, and by failing to inquire whether there was contrary substantial evidence in support of a "fair argument." Appellants fail to cite to any portion of the record which supports their claim of an improper standard of review, and have thus neglected their burden of supporting all factual assertions with citations to the record. (Cal. Rules of Court, rule 15(a).) Perhaps appellants base their contention on the wording of the trial court's order denying their writ petition, which states that "the adoption of a Negative Declaration is supported by substantial evidence in the record." The transcript of the hearing on the writ petition, however, clearly shows the trial court was well aware of the correct standard of review (which had been extensively briefed): "The

point now is whether . . . it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact." The trial court applied the proper standard of review.

■■■ Appellants next contend that the adoption of the negative declaration was improper because the administrative record contains substantial evidence of a "fair argument" for significant environmental impact. " 'Substantial evidence' as used in [the CEQA] guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . ." (Guidelines, § 15384, subd. (a).)

First, appellants contend the closure will result in a significant impact on traffic patterns in the Sunset neighborhood. Respondents' traffic study concluded that the major intersection of Santa Clara and Jackson Streets will suffer increased traffic volume of 2 percent and 1 percent, respectively, during the morning and evening rush hours. The intersection is already operating at "level of service E," an engineering classification of heavy traffic flow causing significant delays. Appellants rely on the declaration of Renato Martinez, a certified civil and traffic engineer, which states that in Martinez's opinion a 1 percent increase at a "level of service E" intersection is significant.

The projected increase translates to an increase of two cars and one car per minute during the rush hour periods. The question is whether the increase of a few cars per minute in an already congested intersection would wreak a "significant" impact on the environment. While appellants' expert opines that a 1 percent increase at such a crowded intersection is considered significant, the traffic study concluded it was not. Conflicting assertions do not ipso facto give rise to substantial "fair argument" evidence. (*Friends of "B" Street* v. *City of Hayward, supra*, 106 Cal.App.3d at p. 1002.)[2]

"An ironclad definition of significant effect is not possible because the significance of an activity may vary with the setting." (Guidelines, § 15064, subd. (b).) Disagreement of expert opinion regarding significance of an environmental effect only requires an EIR in "marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment . . . ." (Guidelines, § 15064, subd. (h).) The 54-page traffic study examined projected traffic impacts in detail and concluded that there would be no significant adverse impact on the

---

[2] Unlike *Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612 [263 Cal.Rptr. 813], on which appellants rely, in this case the municipality has not formally adopted a specific standard for significant increases in traffic volume.

environment. No intersection would suffer a 10 percent increase in delay, which the City of Hayward would consider "significant." The report concluded most streets would experience no traffic impacts, and on some the impacts would be positive. This cannot be considered a "marginal case" rendering significant a difference of expert opinion.

Appellants also argue the traffic study is obsolete in light of the traffic changes caused by the major earthquake of October 17, 1989. Appellants presented evidence that Hayward city traffic *in general* was increased due to rerouting of traffic around the damaged Nimitz Freeway. No evidence was presented that the environs of Sunset suffered increased traffic flow. Appellants' precatory language defeats their own argument and shows it to be speculative: "if post-earthquake studies conclude" that pertinent intersections have increased traffic flow "then the project increases *will be* significant." Speculation is not evidence.[3]

Second, appellants contend there was substantial "fair argument" evidence regarding the environmental effects on parking near Sunset. Appellants refer to the 200-space deficiency described in the preliminary negative declaration. Of course, this deficiency was not described as a *significant* environmental impact; appellants assume that it is without explaining why or what evidence supports a conclusion of significance. Moreover, the Board has adopted mitigation measures to rectify the deficiency. Appellants further rely on a conclusory comment by Martinez that some community center patrons might park on the street instead of in the lot, thereby competing with local residents for parking. ■ Again, speculative possibilities are not substantial evidence of environmental impact. (*Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424, 435, fn. 6, 436 [187 Cal.Rptr. 53].)

■ Third, appellants urge an adverse impact on public transportation. They refer to respondents' estimate that 575 Sunset students will have to travel more than two miles to school upon closing of Sunset. They contend that AC Transit will lack capacity to handle the increased passenger load. There is no evidence in the record to support such a contention, and the record shows the existing capacity is sufficient. Appellants also note that because AC Transit does not overload its buses, there is a possibility that students will be forced to wait at a bus stop in the dark until a later, and less crowded, bus arrives. The traffic study indicated that such delays could

---

[3] Appellants complain that the trial court failed to consider a declaration outside of the administrative record in which a traffic engineer stated that Hayward postearthquake traffic is heavier than normal. The declaration does not specifically discuss the environs of Sunset and is of little pertinence herein.

occur, and students could be forced to wait 20 to 30 minutes for a following bus. The study concluded, however, that this would occur in the afternoon just after school let out. There is no evidence that students would be stranded *in the dark,* except a passing reference, in a comment at the public hearing, to that possibility for football players leaving school at 6 p.m. after practice. Appellants have presented no evidence that this possibility will either result in increased physical danger to students or amount to a significant environmental impact.

Fourth, appellants maintain there is substantial evidence of increased physical harm to relocated Sunset students because of (1) the likelihood of a major earthquake along the Hayward Fault and (2) altercations with students at schools receiving transferred Sunset pupils. Respondents' environmental studies acknowledge the 20 percent likelihood of a 7.0 earthquake along the fault in the next 30 years; concerned parents speculated whether the new routes to and from school for relocated students would be "earthquake safe." There is no evidence in the record, however, that the closing might cause an increased vulnerability to earthquake-related harm; again, appellants speculate that there *might* be such a danger, without hard fact. The record suggests that many of the relocated students will be in a seismically safer area, and the District has a comprehensive earthquake response plan. With regard to physical harm caused by altercations with students, appellants presented only the "common-sense viewpoint" of a "youth crime expert" who opined that Sunset students would be perceived as outsiders. This same expert, however, admitted Hayward campuses had no particular problem with violence, that he perceived no particular problem with gang violence, and that he would have no difficulty sending his own children to Hayward public schools. The Hayward Police Department and the expert agreed that Sunset had no more of a gang problem than other Hayward high schools. Appellants simply have no substantial evidence of a danger to Sunset students.

Fifth, appellants urge they have presented substantial "fair argument" evidence of adverse social, cultural and economic impacts from the closing of the school. It is undisputed that Sunset enjoys a considerable reputation as an effective school providing valuable educational services, especially to low-income and bilingual students. Appellants point to the declarations of Thomas Carter and Selina Bendix, which recite that the closure of Sunset would have a devastating social and academic impact on Sunset students, particularly disadvantaged ones. Appellants also rely on Dr. Bendix's opinion that Sunset is culturally significant to the local Hispanic community "because it has been uniquely successful in educating their children and keeping them in school." Appellants also indicate questions were put to the

District concerning the economic impact on small businesses and property values. The question remains whether these effects, if actual, are cognizable as significant environmental impacts under CEQA.

CEQA concerns itself with physical changes to the physical environment. "Effects analyzed under CEQA must be related to a physical change." (Guidelines, § 15358, subd. (b).) The Guidelines define " '[e]nvironment' " as "the physical conditions which exist within the area which will be affected by a proposed project . . . ." (Guidelines, § 15360.) Thus, a cultural impact under CEQA must be tied to the specific cultural significance of an affected piece of property. (Guidelines, appen. G, subd. (j).) "CEQA will come into play only if a disruption of the physical environment has cultural significance." (*Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 279 [254 Cal.Rptr. 778].)

The only physical change to the Sunset site is the replacement of high school students and teachers with participants in a community center. Even assuming this physical change is sufficient to trigger a concern for cultural impact under CEQA, appellants have not established any substantial evidence that the site of Sunset is of cultural significance. We have no dispute with, indeed we applaud, the assertions in the record that Sunset has been effective in educationally motivating students. We also do not dispute that many would, as a political or social matter, prefer to see Sunset remain open. The issue before us is whether Sunset's programs have a site-specific cultural impact cognizable under CEQA. The record indicates the valuable bilingual education programs will be continued at other schools, and the District has concluded all students will benefit overall from the consolidation of four high schools into three. Like the significant cultural funeral customs at issue in *Cathay Mortuary, supra*, the significant educational programs are offerable elsewhere and are not "tied in some manner to [a] particular site." (207 Cal.App.3d at p. 279.) There is simply no evidence of a cognizable cultural impact in this record.

"An economic or social change by itself shall not be considered a significant effect on the environment." (Guidelines, § 15382.) Such a change is only to be considered to determine if a physical change (either the cause or the effect of the economic and social changes) is a significant impact. (Guidelines, § 15065; accord *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 197 [228 Cal.Rptr. 868].) Appellants argue impermissibly that the economic and social changes are themselves significant. Moreover, the social impacts would seemingly be compensated for by the renewal of Sunset's educational programs at other schools. The only record evidence of economic effects are conclusory statements that small businesses might

be forced to close; however, the record shows considerable evidence of a lack of an economic impact from the replacement of the high school with a community center.

In sum, appellants have failed to establish that the record below contains substantial evidence that a "fair argument" of a significant environmental impact can be made.[4] Moreover, as the above discussion reveals, this is not a "marginal case" which would require an EIR because of public controversy or the disagreement of experts. (Guidelines, § 15065, subd. (h).)

Appellants further contend that the negative declaration was adopted in violation of CEQA procedures. They argue that the mitigating measures recommended by the environmental consultants—concerning parking, AC Transit cooperation and Thursday night football—should have been incorporated into a revised project plan before the preliminary negative declaration was released for public review. (Guidelines, § 15070, subd. (b)(1).) Assuming this is a requirement (but see, *Perley* v. *Board of Supervisors, supra*, 137 Cal.App.3d at p. 431), this applies only to mitigation of *significant* environmental effects.

## CONCLUSION

The decision to close a popular high school is a decision of educational policy with political and social overtones. It is only secondarily a decision that might impact the environment within the meaning of CEQA. Our inquiry in this case is not into the wisdom or the propriety of the decision to close Sunset; we are not empowered to engage in managerial review of educational policy choices. Rather, our review is delimited by the confines of environmental law. On this record we conclude that regardless of the wisdom of the District's decision, the applicable provisions of CEQA have not been violated.

The order is affirmed. The parties shall bear their own costs.

King, J., and Haning, J., concurred.

---

[4] Appellants stressed at oral argument that they have established a "fair argument" because the District has failed to conduct an adequate review of environmental questions. (*Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 311.) We disagree with appellants' assessment of the adequacy of the District's review.