[No. A073177. First Dist., Div. Two. Apr. 30, 1997.]

ANTHONY F. SILVEIRA et al., Plaintiffs and Respondents, v.
LAS GALLINAS VALLEY SANITARY DISTRICT, Defendant and
Appellant.

[No. A074836. First Dist., Div. Two. Apr. 30, 1997.]

ANTHONY F. SILVEIRA et al., Plaintiffs and Appellants, v.
LAS GALLINAS VALLEY SANITARY DISTRICT, Defendant and
Respondent.

**COUNSEL**

Nossaman, Guthner, Knox & Elliott, Douglas J. Maloney, Michael B. Wilmar, McNeil, Silveira & Rice and Ronald A. Silveira for Plaintiffs and Respondents and Plaintiffs and Appellants.

McCracken, Byers & Bergeron and David J. Byers for Defendant and Appellant and Defendant and Respondent.

**OPINION**

**LAMBDEN, J.**—Anthony F. Silveira, Joseph F. Silveira, and Dolores M. Cordeiro, as individuals and partners, and the partnership of Silveira Ranches (Silveiras) filed a petition for a peremptory writ of mandate because the Las Gallinas Valley Sanitary District (LGVSD) failed to prepare an environmental impact report (EIR) when it authorized the condemnation of the property adjacent to its sanitation plant. LGVSD appeals from the judgment granting the petition, claiming the California Environmental Quality Act (CEQA) does not mandate an EIR because the project would simply

create an odor buffer zone and would not alter the natural state of the condemned property. We agree with LGVSD.

The Silveiras appeal from a separate order denying them attorneys' fees pursuant to Code of Civil Procedure section 1021.5. On the court's own motion, we have consolidated the two appeals. Because we will reverse the judgment vacating the negative declaration and requiring an EIR, the Silveiras did not prevail under Code of Civil Procedure section 1021.5 and are not entitled to attorneys' fees.

### Background

LGVSD, a sanitary district organized pursuant to the Sanitary District Act of 1923, Health and Safety Code section 6400 et seq., has provided sewage treatment for northern San Rafael in the County of Marin since 1955. The sewage treatment facility operates under a permit from the Bay Area Air Quality Management District (BAAQMD) (Health & Saf. Code, §§ 40200, 40232).

The Silveiras have owned an 87-acre ranch bordering the sanitation plant since 1900 (Silveiras' property). The Silveiras rejected LGVSD's offers to purchase the property or obtain an easement over it to create an "odor buffer zone and air toxics [*sic*] buffer zone."

LGVSD became concerned about possible odor complaints if the Silveiras' property became a residential development. LGVSD's 1990 report entitled "Long-Range Plan for Wastewater Collection, Treatment and Disposal" stated: "The estimated cost of complete odor control facilities, including covering all process units with aluminum domes, installing ventilating fumes and odor scrubbers is around $2,000,000. If the District acquires a buffer, some of these facilities may not be needed."

LGVSD wrote a letter dated October 20, 1992, to San Rafael's St. Vincent/Silveira committee members explaining the need to use the Silveiras' property as an odor buffer zone. The letter stated, in pertinent part: "The buffer zone will also satisfy health risks posed to residents within 820 feet as required by the Bay Area Air Quality Management District. The risks of cancer, as well as other health concerns, arises [*sic*] out of the emission of potentially carcinogenic or other harmful compound from the treatment process. Our board feels that is [*sic*] does not make sense build [*sic*] near the plant and expose residents to health hazards, then attempt to mitigate present and future dangers. The costs estimates for sampling and testing program would range from $50,000 to $100,000, and plant modifications could range from hundreds of thousands to millions of dollars."

Once negotiations with the Silveiras failed, LGVSD began condemnation proceedings. In undertaking its condemnation project, LGVSD conducted an initial study, drafted a proposed negative declaration, and filed a notice of proposed negative declaration. LGVSD circulated the negative declaration to all relevant agencies and interested parties.

Except for the Silveiras, every agency and interested party (including the local Sierra Club and Marin Audubon Society) supported the negative declaration. The Silveiras challenged the adoption of the negative declaration and the resolution of necessity by letter and by personal appearance at the scheduled hearings.

At the conclusion of the public hearings on May 11, 1995, LGVSD determined the project would not have a significant effect on the environment and adopted a final negative declaration. LGVSD adopted a resolution of necessity authorizing condemnation of the Silveiras' property, and filed a notice of determination with the county clerk on May 12, 1995.

The Silveiras filed a petition for a peremptory writ of mandate on June 8, 1995. The trial court heard the writ on December 1, 1995, and granted the petition on January 3, 1996.

After judgment vacating the negative declaration was entered, the Silveiras moved for an award of attorneys' fees. The court denied the motion and found the Silveiras had failed to establish the "litigation imposed a financial burden which was 'out of proportion to [their] individual stake in the matter.'"

### DISCUSSION

LGVSD appeals the trial court's finding it failed to comply with CEQA and must prepare an EIR. It plans to use the Silveiras' property as a odor buffer zone and therefore, it argues, no environmentally significant new odors will result from the acquisition of the property. It likens this situation to the one in *Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 278 [254 Cal.Rptr. 778] (*Cathay Mortuary*). In *Cathay Mortuary,* the City and County of San Francisco wanted to use the site of a mortuary to develop a park. Such an acquisition did not require an EIR, since the park would not have any significant adverse effect on the environment.

Land remaining in its natural state cannot, LGVSD maintains, have a significant adverse environmental effect. LGVSD claims the Silveiras confused the trial court so it believed the project would create a toxic dispersal

zone to spread toxins on the neighboring property. The sole reason it wants the adjacent land, LGVSD insists, is to prevent inconsistent development. In response, the Silveiras urge us not to permit LGVSD to hide the potential adverse impacts of its project behind the facade that acquiring property by condemnation constitutes a mere change in ownership and does not need environmental review.

Under CEQA, all local agencies must prepare an EIR on projects which "may have a significant effect on the environment." (Pub. Resources Code, § 21151, subd. (a).) Public Resources Code section 21060.5 defines the environment as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." Public Resources Code section 21151 "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317 [8 Cal.Rptr.2d 473].) An EIR functions as " 'an environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return' [citation] and 'to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action' [citation]." (*Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 186 [228 Cal.Rptr. 868].)

If a project may have a significant environmental effect, the agency having principal responsibility for implementing the project must conduct an initial threshold study. (*Cathay Mortuary*, *supra*, 207 Cal.App.3d 275, 278.) " 'If the initial study reveals that the project will not have such effect, the lead agency may complete a negative declaration briefly describing the reasons supporting this determination. [Citation.]' " (*Ibid.*; Pub. Resources Code, § 21080, subd. (c)(1).)

When a party claims the lead agency should have prepared an EIR rather than a negative declaration, ". . . the court reviews the administrative record to determine whether 'it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.]" (*Cathay Mortuary*, *supra*, 207 Cal.App.3d at p. 278.) " 'Substantial evidence' [is] enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).) "Since CEQA's concern is about the likely future impact of a yet undeveloped project, the evidence will obviously consist of predictions with varying degrees of plausibility." (*Leonoff* v.

*Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1348 [272 Cal.Rptr. 372].)

"If there is no substantial evidence to support the agency's conclusion a fair argument cannot be made that the project will have a significant environmental impact, then the agency's action in adopting a negative declaration amounts to an abuse of discretion by the agency and a failure to proceed in a manner required by law. [Citation.]" (*Christward Ministry* v. *Superior Court, supra*, 184 Cal.App.3d at p. 187.) "Thus, the applicable standard of review appears to involve a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard which usually results in great deference being given to the factual determination of an agency." (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602 [35 Cal.Rptr.2d 470].) LGVSD retains the "benefit of the doubt on any legitimate, disputed issues of credibility" (*id.* at p. 1603), but we will uphold LGVSD's decision only if no credible evidence to the contrary exists (*Stanislaus Audubon Society, Inc.* v. *County of Stanislaus* (1995) 33 Cal.App.4th 144, 151 [39 Cal.Rptr.2d 54]).

 In this case, the court found LGVSD abused its discretion in failing to complete an EIR for the following reasons:

"1. The Initial Study prepared by Respondent is deficient because it does not provide any explanations for the answers to the checklist upon which it relies, as required by California CEQA Guideline 15063. These and other deficiencies in the record have enlarged the scope of fair argument by lending a logical plausibility to a wide range of inferences.

"2. The project description in the initial study is incomplete and is inconsistent with the project description contained in Respondent's Resolution of Necessity, (Resolution 1605) because the initial study description is limited to emission of 'odors' whereas the description in the Resolution of Necessity includes emission of 'fumes, gases, and air,' a significantly more extensive description which may include toxins.

"3. The record contains credible and substantial evidence which supports a fair argument that the project may have significant environmental impacts, including, but not limited to:

"(a) Significant impacts on land use[;]

"(b) Significant impacts on population[;]

"(c) Increase in odors[;]

"(d) Possible dispersion of toxins[;]

"(e) Risk of upset including potential harm to human health and the environment[;]

"(f) Increased flooding possibilities[; and]

"(g) Loss of agricultural land[.]"

For the reasons set forth below, we find the Silveiras did not establish a "fair argument" based on "substantial evidence" that the acquisition of the land as a buffer zone may have significant environmental impacts. We find, therefore, LGVSD did not abuse its discretion in deciding not to prepare an EIR.

## I. The Initial Study

The Silveiras contend the completion of a proper initial study is relevant to determining whether the agency made a "good faith effort" to comply with the CEQA Guidelines. (*Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 305 [248 Cal.Rptr. 352] (*Sundstrom*).) A significant purpose of the initial study is to "[p]rovide documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15063, subd. (c)(5).) The LGVSD's initial study consisted of a nine-page checklist and a two-page project description.

The Silveiras claim the initial study was defective because it used a checklist and failed to explain the "no" answers it had checked. Additionally, the Silveiras assert, LGVSD did not provide an accurate description of the program. Consequently, they conclude LGVSD must complete an EIR to evaluate the potential environmental impacts. "Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided . . . ." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67]; see also *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 366 [212 Cal.Rptr. 127].)

## A. The checklist

The checklist in the initial study consisted of 81 questions, and LGVSD simply checked "no" to 80 of them without offering any explanation.

(LGVSD responded "yes" to one question pertaining to population changes.) Failing to explain the answers, the Silveiras maintain, contravenes the CEQA Guidelines. Furthermore, "[m]ere conclusions simply provide no vehicle for judicial review." (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 171 [217 Cal.Rptr. 893] (*Citizens Assn.*).)

The CEQA Guidelines approve of the use of a checklist, but the initial study must also contain the following (Cal. Code Regs., tit. 14, § 15063, subd. (d)(3)): "An identification of environmental effects by use of a check-list, matrix, or other method, provided that entries on a checklist or other form are briefly explained to indicate that there is some evidence to support the entries. The brief explanation may be either through a narrative or a reference to another information source . . . ." California Code of Regulations, title 14, section 15063, subdivision (f), states a checklist will comply with the requirements for an initial study "provided that the entries on the checklist are briefly explained pursuant to subsection (d)(3)."

Therefore, the Silveiras maintain, a checklist only satisfies the CEQA Guidelines if the agency explains the answers. (*Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d 1337 [initial study was not defective because entries were explained].) The Silveiras contend the unexplained answers support a fair argument the project would have significant environmental impacts. (*Christward Ministry* v. *Superior Court*, *supra*, 184 Cal.App.3d 180, 197; *Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at p. 1348 [agency has responsibility for creating an adequate record and any deficiencies due to the public agency's lack of investigation " 'may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences' "].)

LGVSD argues its initial study was not defective just because it used a nine-page "checklist" without providing written support for each negative answer. Mere answers are insufficient when the reviewing court cannot determine whether evidence supported those answers because of the failure to disclose the raw data. (*Citizens Assn.*, *supra*, 172 Cal.App.3d 151, 171-172.) LGVSD claims it did not rely on any outside data; thus, it had no data to disclose. The reviewing court, then, can determine from the record whether acquiring land would have any environmental impacts.

The Silveiras entreat us not to permit LGVSD to evade the CEQA Guidelines by claiming "there is nothing to be disclosed." "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to

the extent possible on scientific and factual data." (Cal. Code Regs., tit. 14, § 15064, subd. (b).) We find, however, if a party merely purchases a property and plans to make no changes or alterations to the acquired property, no further "scientific" or "factual" data are necessary.

## B. *The project description*

In addition to the inadequacy of the checklist, the Silveiras maintain the two-page project description was incomplete, perfunctory, and inaccurate. "An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity. [Citation.]" (*McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].) "An accurate, stable, and finite project description is the *sine qua non* of an informative and legally sufficient EIR. . . . [¶] . . . A curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 193, 198 [139 Cal.Rptr. 396]; *McQueen* v. *Board of Directors*, *supra*, 202 Cal.App.3d at p. 1143; *Mira Monte Homeowners Assn.* v. *County of Ventura*, *supra*, 165 Cal.App.3d 357, 365; *Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498] (*Airport Authority*).)

The Silveiras contend the project description in the initial study differs significantly from later descriptions of the project. The initial study described the project as follows: "The District wishes to acquire a fee interest in the above parcel to presently act as a buffer for odor control, and to provide for anticipated future needs." The initial study, the proposed negative declaration, and the final negative declaration affirm the property was to be acquired "to presently act as a buffer for odor control." In contrast, the resolution of necessity stated the property is to be acquired "in order to mitigate any adverse effects from the discharge of odors, fumes, gases and air from the facility of the Las Gallinas Valley Sanitary District . . . ." Thus, according to the Silveiras, the project description in the initial study was fatally flawed as it did not include the words "fumes" and "gases," which, unlike odors, can include toxins.

LGVSD claims the record shows the inherent release of odors from waste treatment plants served as the impetus for this project, not the release of toxins. The only relation toxic fumes had to this project was the BAAQMD's regulation requiring a precautionary risk assessment when residential development takes place within 820 feet of a waste treatment plant. More significantly, whether the sewage treatment plant presently emits odors or gases or fumes is immaterial. The issue is whether the acquisition of the adjacent

property will *alter* the amount or type of odors, fumes, or gases already emitted.

The Silveiras attempt to further their argument by relying upon *Airport Authority, supra,* 233 Cal.App.3d 577, 592; *City of San Jose* v. *Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1015 [237 Cal.Rptr. 845] [original EIR based on a project to provide water drawn from preexisting wells was significantly different than the new project which included building three new wells]; and *McQueen* v. *Board of Directors, supra,* 202 Cal.App.3d 1136, 1146-1147 [project was not simply the acquisition of improved property but also included the storage or disposal of PCB (polychlorinated biphenyl) and other hazardous wastes on the acquired property]. In particular, they claim *Airport Authority* closely resembles this case because the court found the description of the project, which involved condemning petitioner's property, did not include sufficient environmental review. The Silveiras fail to note, however, the project description was inadequate because it did not specify the exact location and design of the taxiway/service road which it planned to build on the condemned property. (*Airport Authority, supra,* 233 Cal.App.3d at p. 593.)

A review of the facts of the above three cases establishes they have little applicability to the facts of this case. The lead agency in the three cases cited by the Silveiras planned to make a physical change to the acquired land by creating a well or taxiway/service road on the property or removing (or storing) toxic chemicals on the land. In contrast, LGVSD does not plan to modify either the acquired land or its sewage treatment facility. The Silveiras are complaining about the differences between using the words odors, "noxious vapors," fumes, or gases in its reports; but these terms all relate to emissions the sewage plant already disperses onto their property. Such complaints, even if justified, do not specifically relate to the project which is the subject of the negative declaration. The Silveiras have pointed to nothing in the record which shows any *increase* or *modification* in the release of these noxious fumes.

The Silveiras next argue that LGVSD does not plan to leave the property in its natural state and may expand the treatment facility in the future. The resolution of necessity stated LGVSD plans "to use the property for expanded treatment facilities" in the future. Moreover, the Silveiras argue, the initial study admits that the acquisition of the property is "to presently act as a buffer zone" and states nothing about the future. The actual project, the Silveiras maintain, includes dispersion of fumes and not just land acquisition. They claim: "The record abounds with substantial evidence that the actual project is the immediate creation of a buffer zone which will enable

the Appellant to discharge, *or continue to discharge* odors into the air." (Italics added.)

If LGVSD plans a different project or an expanded treatment facility in the future, that project would be a substantially different project than the one considered here and it would have to receive separate approval and a separate determination whether an EIR would be required. The only project being considered is acquiring the adjacent property, making no changes to that property, and using it as an odor buffer zone. "Continuing to discharge" odors into the air does not constitute a new project requiring an EIR.

C. *An inadequate initial study does not necessarily mandate an EIR*

An inadequate initial study does not automatically make an EIR necessary. As LGVSD points out, every case cited by the Silveiras holding the initial study did not justify a negative declaration also found substantial evidence in the record to support a fair argument the project may have a significant environmental effect. Thus, for example, in *Christward Ministry* v. *Superior Court, supra,* 184 Cal.App.3d 180, the agency had conducted an initial study regarding the San Marcos Landfill and checked "no" to every possible environmental consequence. The checklist and the answers to it would have been sufficient if the city, by amending the general plan, "was acknowledging or renaming an existing use . . . ." (*Id.* at p. 197.) The city, however, planned to allow a new solid waste management facility at the site, which clearly had a potentially significant environmental consequence. (See also *Sundstrom, supra,* 202 Cal.App.3d 296, 304 [later evidence showed the project on sludge disposal would disturb drainage and local plant conditions, although the initial study did not address these problems]; *Stanislaus Audubon Society, Inc.* v. *County of Stanislaus, supra,* 33 Cal.App.4th 144, 152-156 [proposed country club might have a significant adverse growth-inducing effect on the surrounding area]; *Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th 1597, 1604 [proposed subdivision could have a significant impact on public park's views].)

Furthermore, when the agency bases its decision on more information than that contained in the initial study, the additional information may cure any defects. (*Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d 1337, 1347.) "The decisionmaking body shall approve the negative declaration if it finds on the basis of the initial study and any comments received that there is no substantial evidence that the project will have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15074, subd. (b).) Here, LGVSD presents an 893-page administrative record to establish the project has been reviewed thoroughly for over 5 years.

Thus, a defective initial study does not necessarily mandate an EIR. We therefore review the record to determine whether substantial evidence supported a fair argument that acquiring the Silveiras' property would have environmental impacts.

## II. *No Substantial Evidence of a Fair Argument of Environmental Impacts*

■ LGVSD argues no substantial evidence established the project would have significant adverse impacts on the environment. As already explained, the standard of review is not the deferential standard of substantial evidence; but rather, we look to see if substantial evidence supports a fair argument of environmental impacts. When reviewing the evidence, we will not consider evidence or arguments about the impact from the *existent* sewage plant. Rather, we will only review all plausible evidence related to environmental impacts resulting from the acquisition of the property:

(1) *Land use*: The Silveiras claim their property is now zoned as agricultural and the San Rafael General Plan recommends it be zoned for residential/commercial. Thus, they argue, creating a toxic buffer zone inherently conflicts with these city and county plans.

Acquiring the land will not change the current use of the land but will prevent residential development next to a sewage treatment plant. LGVSD asserts it could retain the Silveiras' property in its natural state or lease it back to the Silveiras for farming, which is how it is being used now. Thus, we find a change in ownership in the land will produce no change in the current use of the land.

(2) *Population*: The Silveiras argue a severe shortage of affordable housing exists in Marin and the property has been designated as a "Housing Opportunity site" by the City of San Rafael. Once LGVSD acquires the property, it will no longer be available for housing. LGVSD agues the land is not being used for housing now, and we find there is no reason to assume the land should be used to build homes.

(3) *Odors*: The Silveiras again argue the project's purpose is to provide dispersion of odors. Moreover, the Silveiras claim, one of LGVSD's directors acknowledged the impact of the odors when he stated at a hearing: "It seems to me that acquiring an easement for an odor does have some sort of an odor significance or other. I think Mr. Maloney has a point there."

LGVSD argues the administrative record does not suggest it will change the operation of its plant to produce more or different odors. For the reasons we have already explained above, we agree with LGVSD.

(4) *Dispersion of toxins:* LGVSD argues it meets all of its requirements of the BAAQMD permit. In the event LGVSD later decides to change the operation of its plant so it disperses different or additional toxins or odors, the EIR requirements would probably be triggered.

(5) *Potential harm to human health and environment:* The buffer zone itself poses no risk of upset nor can it be argued, LGVSD asserts, that the acquisition of the property will lead to greater risk of upset. Rather, by preventing residential development to the edge of the treatment plant, we find this project will reduce the limited risk of upset from the treatment plant.

(6) *Increased flooding possibilities:* The Silveiras' property includes a major levee and pumps which protect the remainder of the entire property from inundation by the waters of Miller Creek. Consequently, the Silveiras argue, the appropriation of the Miller Creek levee and pumps may result in a change in drainage patterns, because of the transfer of control over the flood control facilities.

LGVSD states the question is whether the project will lead to "[c]hanges in absorption rates, drainage patterns, or the rate and amount of surface water runoff." As LGVSD maintains, it could either operate the pumps or allow the drainage patterns to return to the natural setting. No engineering report or other competent evidence demonstrates the acquisition of land to prevent inconsistent development will change physical water drainage patterns.

(7) *Loss of agricultural land:* LGVSD claims nothing precludes it from leasing the land back to the Silveiras for farming.

Other than claiming LGVSD plans to expand the sewage treatment plant in the future or the odors and fumes currently being emitted create a need for an EIR, the Silveiras present no plausible evidence that acquiring the land will result in any environmental impacts. We, therefore, find LGVSD did not have to prepare an EIR.

### III. *Attorneys' Fees*

The Silveiras appeal the court's order denying them attorneys' fees under Code of Civil Procedure section 1021.5. Code of Civil Procedure section 1021.5 provides, in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting

the public interest . . . ." Since we are reversing the court's judgment and the Silveiras are not the successful party, they are not entitled to attorneys' fees under this statute.

CONCLUSION

We find substantial evidence did not support a fair argument that acquiring the Silveiras' property would result in significant environmental impacts. Accordingly, we reverse the judgment (1) vacating the final negative declaration and resolution of necessity and (2) requiring an EIR. Since the Silveiras were not the successful party, they were not entitled to attorneys' fees pursuant to Code of Civil Procedure section 1021.5, and we affirm the order denying attorneys' fees. The Silveiras are to pay costs for both appeals.

Kline, P. J., and Haerle, J., concurred.

The petition of plaintiffs and respondents for review by the Supreme Court was denied July 16, 1997.