[No. D011126. Fourth Dist., Div. One. Feb. 13, 1991.]

TED UHLER et al., Plaintiffs and Appellants, v.
CITY OF ENCINITAS et al., Defendants and Respondents.

798

COUNSEL

Bruce R. Babcock for Plaintiffs and Appellants.

Mark A. Potter for Defendants and Respondents.

Georgiou & Tosdal, Byron S. Georgiou, Berlin & Albert and Michael D. Berlin as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WIENER, Acting P. J.**—In response to complaints about excess traffic from residents and business owners (the Crest group)[1], the Encinitas City Council approved a plan to make a portion of Crest Drive one way by constructing a barrier across the north-bound lane at the intersection of Crest and Santa Fe. Residents of nearby Lake Drive (the Lake group)[2] vigorously opposed the plan. On August 10, 1988, the city council certified an amended negative declaration with mitigation measures, allowing the project to proceed without the preparation of an environmental impact report.

Plaintiffs Ted Uhler, Edmund Cardosa, and L. James Lockwood appeal from the judgment denying their petition for writ of mandate to set aside the city council's "decision to close Crest Drive to through traffic." They present three principal contentions based on violations of the California Environmental Quality Act (CEQA), the safety element of the general plan, and Vehicle Code limitations of local government action. We explain why the first two contentions lack merit. We then conclude the city council's actions lacked authorization under the Vehicle Code and reverse the matter for further proceedings. However, we do not instruct the trial court to issue a writ of mandate requiring removal of the barrier.

### FACTUAL AND PROCEDURAL BACKGROUND

We paraphrase the factual summary submitted by the City of Encinitas (City):

Crest Drive runs north and south. At issue is an eight-tenths of a mile segment of Crest which intersects Santa Fe Drive in the north and Birmingham Drive in the south. Lake Drive parallels Crest Drive on the west.

In early 1987 the Crest group complained to the City about traffic volume and safety. The City commissioned a study by the traffic engineering firm of Schatzmann, Thompson & Associates. The report discussed various actions the City might take and concluded there was serious overuse of Crest Drive

---

[1] Amicus curiae Palomares Heights Association states it is the real party in interest representing "over 95% of the over 80 homeowners on the affected section of Crest Drive and all of the over 10 Crest Drive businesses, except the two named appellants." The association appeared on behalf of the affected Crest drive homeowners before the Encinitas City Council, Encinitas Planning Commission, the California Coastal Commission, and as amicus curiae before the San Diego County Superior Court.

[2] The Lake group was represented by S.A.F.E. (Safety Always for Everyone). Plaintiffs Ted Uhler and Jim Lockwood are officers of S.A.F.E.

by commuter traffic and "the type of through trips which are using this roadway should be avoided . . . ." The report continued:

"If the decision to close Crest Drive is chosen there should be additional environmental work performed. The environmental assessment should at least be [focused] to cover the traffic and emergency vehicle access issues. The other options would not significantly change the road system and additional assessment would probably not be required." The city attorney recommended environmental assessment of any proposed project.

Following a public hearing on May 26, 1987, the city council decided against closing Crest Drive. They did, however, approve a plan to reduce through traffic on Crest by: 1) placing an island on Santa Fe to prevent left turns at the intersection of Santa Fe and Crest; and 2) making Birmingham one way, west only, between Crest and Lake.[3] The city council directed staff to prepare an initial study to identify potential environmental impacts of the proposed project.[4]

Staff presented the results of the initial study to the planning commission on August 11, 1987. The study outlined three possible courses of action:

"a.  Recommend the preparation of an environmental impact report;

"b.  Issue a negative declaration; or

"c.  Authorize additional study to examine impacts and to find measures that would mitigate the potential significant effects, if any, on the environment."

The Planning Commission authorized an additional study to evaluate the environmental impacts. It hired a second traffic consulting firm, Linscott, Law & Greenspan, Engineers, to analyze traffic conditions in the Crest Drive/Lake Drive area. The Linscott study found that nearly 3,500 vehicles per day used Crest Drive. Of these, 2,500 made "thru" trips. After analyz-

---

[3] Plaintiffs refer to this plan as the "initial project."

[4] The May 26, 1987, city council motion defined the proposed project to include:

"1.  Participation with Caltrans on the traffic signal and 2-lane left turns on northbound off ramp from I-5 and Manchester interchange.

"2.  Construct left turn pockets on Santa Fe Drive at Lake and on Birmingham at Lake.

"3.  Birmingham between Crest and Lake-one way westbound.

"4.  Raised island on Santa Fe Drive.

"5.  Selective enforcement on Lake Drive.

"6.  4-way stop at Lake and Birmingham.

"7.  Minimal paving of Cardiff Drive."

Only items 1 through 4 were included in the initial study.

ing 12 alternative means of reducing traffic on Crest along with various mitigation measures to relieve the potential impact on Lake Drive and other nearby streets, the report concluded: "(1) Crest Drive is significantly impacted by thru, non-residential traffic . . . (4) Alternatives for traffic diversion will impact Lake Drive and adjacent streets, but not significantly as defined by environmental impact measures." The planning commission also reviewed the 18-page staff response to comments submitted by the Lake group. On January 1, 1988, the planning commission recommended that any of the proposed alternatives, with mitigation measures, would qualify for a negative declaration.

The city council considered the proposed project and negative declaration at its May 4, 1988 meeting. The council heard the alternatives discussed in the Linscott, Law & Greenspan report. The Crest group and Lake group presented written proposals and responses which included additional alternatives. Specifically, the Crest group submitted three proposals which included plans and mitigation measures suggested by the Linscott report. The Lake group stated in response: "We support all elements of Crest's preferred plan #1 *except the* proposed barricade. We oppose the barricade and partial closure of Crest Drive for the following reasons . . . ." None of the stated reasons raised environmental concerns.

The city council modified the proposed traffic control project based on the Crest plan No. 1 (East Cardiff Solution No. 1).[5] The revised project deleted the island on Santa Fe and the plan to make Birmingham one way. The new plan made Crest Drive one way south of the Santa Fe intersection by preventing left turns from Santa Fe westbound. The city council certified the negative declaration with mitigation measures and approved the revised project.

On June 22, 1988, the city council requested staff to prepare an implementation schedule and cost estimate for essential mitigation measures. At the July 13, 1988, hearing the city council proposed deletion of the U-turn at Lake and Santa Fe, thereby eliminating $1,450,000 from the estimated $1.5 million cost of the revised project.[6] The staff was directed to prepare an amended negative declaration to reflect deletion of the U-turn.

Based on further analysis, Linscott, Law & Greenspan determined that deletion of the U-turn mitigation measure would not cause significant impacts on Lake Drive. The staff also obtained an evaluation of noise impacts. The acoustics expert concluded that based on proposed changes in

[5] Plaintiffs refer to this project as the "revised project."
[6] Plaintiffs refer to this plan as the "interim project."

traffic flow and traffic speed, noise impacts would not increase on Lake Drive regardless of whether Lake retained its two-lane configuration or was improved to four lanes. No noise mitigation measures were needed. On August 10, 1988, the city council certified the amended negative declaration permitting implementation of the revised project.

In propria persona plaintiff Uhler filed his petition for writ of mandate and injunctive relief on September 29, 1988. In November 1988 Uhler substituted the present attorney of record. Cardosa and Lockwood were added as plaintiffs in January 1989.

The court denied Uhler's ex parte application for a temporary injunction to prevent the construction of the "barricade" to make a portion of Crest Drive one way.

Following the hearing on plaintiffs' request for a writ of mandate and permanent injunction, the court denied all requested relief. The court found "no substantial evidence of significant impact on the environment by the partial closure of . . . Crest Drive; . . . substantial evidence of no significant impact; . . . [and] no violation of CEQA, the Vehicle Code or the Administrative Code . . . ." Plaintiffs unsuccessfully moved to vacate judgment and for new trial. This appeal ensued.

DISCUSSION

I

*CEQA Violations*

*A. Standard of Review*

Public Resources Code section 21168[7] provides for judicial review of an agency's actions under CEQA (§ 21000 et seq.) in accordance with the administrative mandamus procedure set forth in Code of Civil Procedure section 1094.5. "In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in light of the whole record." (§ 21168.)  ■   The court may not substitute its own judgment for that of the local agency. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 173 [217 Cal.Rptr. 893].)

■   On appeal we "merely [review] the record as a whole to determine whether the trial court's findings are supported by substantial evidence

---

[7] All statutory references are to the Public Resources Code unless otherwise specified.

. . . . [T]he record is viewed in the light most favorable to the respondent, indulging all reasonable inferences and resolving all conflicts in support of the judgment." (*Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal.Rptr. 526].)

## B. The Initial Studies

Following preliminary review, an agency "shall conduct an initial study to determine if the project may have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15063, subd. (a).) The purposes of an initial study include providing the agency with information for use in deciding whether to prepare an environmental impact report (EIR) or negative declaration; enabling it to modify a project and mitigate adverse impacts before an EIR is prepared, allowing the project to qualify for a negative declaration; and eliminating unnecessary EIR's. (Cal. Code Regs., tit. 14, § 15063, subd. (c).)

■ Plaintiffs complain the City violated CEQA by approving the "initial project" before it prepared the initial study, approving the "revised project" without any initial study, and approving the "interim project" before it prepared an initial study. They also contend the initial studies prepared by the City were "woefully inadequate" because they failed to consider the Crest Drive traffic problem as a regional traffic problem. With respect to the initial studies, we conclude there is substantial evidence to support the court's finding that the City complied with CEQA.

There is nothing in the agency guidelines to support the plaintiffs' suggestion the City was required to prepare three separate initial studies for the Crest Drive traffic control project. The provision relating to initial studies directs the agency to conduct "an initial study." (Cal. Code Regs., tit. 14, § 15063, subd. (a).) The provision concerning the negative declaration process speaks in terms of "the initial study" without reference to successive initial studies following project revisions. (Cal. Code Regs., tit. 14, § 15070.)[8]

---

[8] Section 15070 reads:

"A proposed negative declaration shall be prepared for a project subject to CEQA when either:

"(a) The initial study shows that there is no substantial evidence that the project may have a significant effect on the environment, or

"(b) The initial study identified potentially significant effects but:

"(1) Revisions in the project plans or proposals made by or agreed to by the applicant before the proposed negative declaration is released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and

"(2) There is no substantial evidence before the agency that the project as revised may have a significant effect on the environment."

Nor was project approval premature. The public hearings on the Crest Drive traffic control project resulted in lengthy discussion of numerous alternative plans of action. The city council had to "approve" the initial project and the interim project before it could direct staff to conduct initial studies on the specific provisions of each project.

The City considered the effects of the project on related projects such as the Lake Drive Sports Complex and the proposed change in Lake Drive's designation from a potential four-lane collector road to a local street. It also considered and responded to numerous additional concerns raised by the Lake group. The City was not, however, required to view the Crest Drive traffic control project as part of a citywide traffic problem. The Crest group raised problems of traffic speed and volume unique to a specific neighborhood. The City addressed citizen concerns by implementing inexpensive traffic control measures in the area bounded by Interstate 5 (I-5) Santa Fe Drive, Crest Drive and Birmingham Drive. There is nothing in the record to suggest the City improperly "chopped up" a larger project to reduce the potential adverse environmental impact. (See *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 193 [228 Cal.Rptr. 868].) The $1,450,000 U-turn on Santa Fe was proposed as a mitigation measure and evaluated when deleted from the "interim project."

*C. The Negative Declaration*

■ Where, as here, plaintiffs claim the agency should have prepared an EIR rather than a negative declaration, "the courts look to see if there was substantial evidence to support the agency's conclusion it could not be 'fairly argued' the project would have a significant environmental impact. [Citation.] If there is no substantial evidence to support the agency's conclusion . . . then the agency's action in adopting a negative declaration amounts to an abuse of discretion by the agency and a failure to proceed in a manner required by law." (*Christward Ministry* v. *Superior Court, supra,* 184 Cal.App.3d 180, 187.) Absent substantial evidence of significant environment effects, public controversy does not require preparation of an EIR. (§ 21082.2, subdivision (a); *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 173.)

■ Plaintiffs maintain the court erred in "finding no substantial evidence of significant impact on the environment by the partial closure of . . . Crest Drive." We reject plaintiffs' argument there is no evidence of no impact.

The negative declaration includes mitigation measures to address potential environmental impacts. The City rejected plans to make Crest Drive a

cul-de-sac. The interim plan provides emergency vehicles with access from either end of Crest Drive. The interim project also incorporates mitigation measures to slow and reduce traffic on Lake Drive, including: (1) a stop sign at Lake and Birmingham; (2) a traffic signal at the intersection of Lake and Santa Fe; (3) reduction of the speed limit on Lake from 40 mph to 30 mph; (4) double-striping on Lake to prohibit passing; (5) installation of signs on other streets to direct traffic away from Lake; (6) possible additional stop signs on Lake to slow and reduce traffic; and (7) cooperation with Cal Trans in the improvement of Manchester off-ramps from I-5 to direct a greater share of traffic to major thoroughfares. Due to these mitigation measures, there would be no increase in noise level on Lake Drive.

Uncontradicted expert testimony supports the finding that the project's environmental impact would be insignificant. The Schatzmann report stated traffic control options other than complete closure of Crest Drive "would not significantly change the road system and additional assessment would probably not be required." The Linscott report concluded the diversion of traffic from Crest Drive would not have a significant impact on Lake Drive "by environmental impact measures." The acoustical consultant determined that noise levels on Lake would decrease by one decibel due to the project's proposed speed control measures.

Plaintiffs supported Crest's preferred plan No. 1—the plan ultimately adopted by the City—except for the partial barricade at the intersection of Crest and Santa Fe. Plaintiffs' stated reasons for opposing the barricade did not involve environmental concerns.

Based on this record we conclude there is substantial evidence to support the court's determination there was no evidence to support a fair argument regarding environmental impact. The court properly found no violation of CEQA.

II

*General Plan Violations*

◼ Plaintiffs also contend the plan approved by the City violates the safety element of the San Diego County General Plan and the proposed Encinitas General Plan. They allege the failure to provide for emergency vehicle turnaround subjects the community to unreasonable risks associated with wildfires.

We do not consider the question of whether violation of the safety element of a general plan voids an approved project. Here, our review of the

record shows the City properly addressed the safety element. The specific concerns expressed by the Encinitas Fire Protection District were addressed and eliminated by the mitigation measures placed in the revised project.

## III

### *Vehicle Code Violations*

■■■ Plaintiffs' second cause of action alleges the City violated Vehicle Code section 21[9] "in voting to close Crest Drive to through traffic." The court determined section 21100 authorizes the City to use the type of traffic diversion at issue here. Plaintiffs contend the court erred in finding the City used an approved traffic control device. They maintain neither section 21100, subdivision (d), 21101, subdivision (f) nor any other statutory exception authorized the City to construct the barrier on Crest Drive. ■■ ■■■ ■■ ■■ We agree the City's action was in violation of Vehicle Code section 21.[10]

The state's preemption of the field of traffic control is set forth in section 21: "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the State and in all counties and municipalities therein, and no local authority shall enact or enforce any ordinance on the matters covered by this code *unless expressly authorized herein.*" (Italics added.)

The City purported to act under chapter 14.12 of the Encinitas Municipal Code and section 21100, subdivision (d).[11] However, these sections pertain to "traffic control devices." Plaintiffs correctly point out the barrier in question is not a traffic control device under any of three applicable definitions.

---

[9] All statutory references in this section of the opinion are to the Vehicle Code unless otherwise specified.

[10] We reject the City's assertion plaintiffs' appeal is barred because they raise new issues for the first time on appeal. Our review of plaintiffs' petition, the City's response and the parties' argument at the hearing on the petition demonstrates the issue was not limited to whether the City could legally close Crest Drive. Plaintiffs' petition specifically alleges the state has preempted the area of traffic control and sections 21100, subdivision (d), 21350 et seq. and 21400 do not authorize the City's action. In response the City argued (1) its actions did not constitute a street closure, (2) it used an approved device, and (3) cities have the right to control traffic by approved methods under the construction and maintenance power.

[11] The purpose of chapter 14.12 is "to establish the procedures for placement of traffic control devices to facilitate the safe movement of traffic." (Encinitas Mun. Code, ch. 14.12.010(A).) Citing Vehicle Code sections 21100, subdivision (d), 21350 et seq., and 21400, chapter 14.12.020 authorizes the city council to establish by resolution locations for traffic control devices. Vehicle Code section 21100, subdivision (d) authorizes local authorities to adopt rules and regulations to regulate traffic by means of "traffic control devices" meeting the requirements of section 21400.

The Encinitas Municipal Code defines traffic control devices to include, "without limitation, signs, signals, crosswalks, street markings, one way streets, no-turn limitation, one-way turn only limitation and lights intended to regulate, guide or warn traffic." (Encinitas Mun. Code, ch. 14.12.010(B).) More specifically, section 440 defines an "official traffic control device" as: "[A]ny sign, signal, marking, or device, consistent with Section 21400, placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic, *but does not include islands, curbs, traffic barriers, or other roadway design features.*" (Italics added.) Section 21400 states in part:

"The Department of Transportation shall . . . adopt rules and regulations prescribing uniform standards and specifications for all official traffic control devices placed pursuant to this code, including, but not limited to, stop signs, yield right-of-way signs, speed restriction signs, railroad warning approach signs, street name signs, lines and markings on the roadway, and stock crossing signs . . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"Any control devices or markings installed upon traffic barriers on or after January 1, 1984, shall conform to the uniform standards and specifications required by this section."

The court erred in reading section 21400 when it found the City's barrier to be an approved traffic control device authorized under section 21100, subdivision (d).[12] Section 440 expressly excludes from its list of approved devices the type of roadway design feature used here—a traffic barrier with curbs. Section 21400 is not inconsistent but merely states that any traffic control device placed on a traffic barrier (a roadway design feature under sections 440 and 21101, subdivision (f)) must comply with the uniform standards for road signs. Placement of an approved road sign on a traffic barrier does not make the traffic barrier an approved traffic control device. Because the barrier at issue is not an approved traffic control device, we conclude the City's action is not authorized under Vehicle Code section 21100, subdivision (d). Section 21657 is similarly inapplicable because it involves the use of "official traffic control devices."

---

[12] In finding no Vehicle Code violation, the court stated:
"It is apparent to me that the City of Encinitas under 21100 would have the right to create the type of diversion that was done here. [¶] Looking at 21400, in which it says such traffic regulation has to meet the requirements of, it is apparent to me, particularly looking at the new section talking about things that took place after January 1st of 1984, . . . they refer to various markings and devices and refer to being upon traffic barriers. And it is implicit to me that they include those items as being permissible usage items by localities and not usurping state powers under Vehicle Code section 21 . . . ."

Nor is the City's action authorized by section 21101, subdivision (f). Section 21101, subdivision (f) states in part:

"Local authorities, for those highways under their jurisdiction, may adopt rules and regulations by ordinance or resolution on the following matters:

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(f) Prohibiting entry to, or exit from, or both, from any street by means of islands, curbs, traffic barriers, or other roadway design features to implement the circulation element of a general plan . . . . [R]ules and regulations authorized by this subdivision shall be consistent with the responsibility of local government to provide for the health and safety of its citizens."

Plaintiffs correctly point out the City's approval of the project was an adjudicative act relating to an isolated project and did not constitute the adoption of a "rule" or "regulation." Missing is local legislation enacted pursuant to section 21101, subdivision (f). The City was considering such legislation when it approved the Crest Drive project. However, because the enabling legislation was not then in effect, the City's action was not authorized under section 21101, subdivision (f).

We also reject the City's argument the barrier was authorized under a general construction and maintenance power. (*Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 556 [183 Cal.Rptr. 73, 645 P.2d 124].) The record makes clear the project was initiated for traffic control, not road maintenance.

We therefore conclude the City approved and constructed the traffic barrier without Vehicle Code authorization. Accordingly, we reverse the judgment. We do not, however, instruct the trial court to issue a writ of mandate ordering removal of the barrier. Over two years have passed since the City approved the project. If the City has enacted the required "rules and regulations" in the interim, removal of the barrier would be an unnecessary and expensive act.

Following remand and after hearing the trial court may issue such orders that may be appropriate in light of "rules and regulations" that may be in force or in the process of adoption.   ■   We also conclude Code of Civil Procedure section 1021.5 does not entitle plaintiffs to attorney's fees. There was no violation of CEQA and the benefit conferred by the Vehicle Code enforcement is insufficient to warrant a fee award.

## DISPOSITION

The judgment is reversed for further proceedings consistent with this opinion. Each party to bear its own costs.

Work, J., and Froehlich, J., concurred.

A petition for a rehearing was denied March 6, 1991, and appellants' petition for review by the Supreme Court was denied May 15, 1991.