Opinion
WORK, Acting P. J.
Quial Botanical Gardens Foundation, Inc. (Quail) appeals a judgment denying its petition for peremptory writ of mandate. Quail seeks to vacate the approval and certification by the City of Encinitas (City) of a negative declaration under the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) regarding a proposed subdivision by Beck Properties, Inc. (Beck). Quail contends the City (i) improperly approved the negative declaration, because there is substantial evidence to support a fair argument significant environmental impacts may occur if the subdivision is built as proposed; (ii) abused its discretion by failing to consider whether an environmental impact report should be required for the proposed subdivision; (iii) improperly deferred mitigation measures which should have been specifically addressed in the negative declaration; and (iv) improperly prevented Quail from refuting Beck’s testimony regarding toxic contamination on the subdivision property. Quail also contends the court erred in failing to consider posthearing evidence on the toxic contamination issue. Because we conclude there is substantial evidence supporting a fair argument significant environmental impacts may occur as a result of the subdivision as proposed, we conclude the City erred in certifying the negative declaration. Accordingly, we reverse the judgment with directions.
*1600 I
Quail is a nonprofit corporation dedicated to preserving and enhancing the Quail Botanical Gardens (Gardens), a 27-acre public park known for its rare and endangered plant species and which is located in the City and owned by the County of San Diego. The Gardens also supports a wide variety of bird and animal wildlife, including the California quail. Quail has about 12,000 members and conducts tours and educational programs at the Gardens for students and the general public. The Gardens annually has about 120,000 visitors from across the United States and around the world.
In December 1991, Beck applied for a tentative map for its proposed 12.6-acre subdivision in the City which Beck would convert from an existing greenhouse and agricultural use to a 40-lot residential single-family home subdivision. The proposed subdivision is adjacent to the Gardens along its entire western boundary and along the southern boundary of its western extension. The City conducted an initial study of the potential environmental impacts of the proposed subdivision and published its notice of intent to consider adoption of a mitigated negative declaration on April 21, 1992. Brian F. Mooney Associates (Mooney), apparently the City’s environmental consultant, determined the potential significant environmental effects of the subdivision could be mitigated by implementing certain measures set forth in the proposed mitigated negative declaration.
After three hearings, the Old Encinitas Civil Advisory Board recommended the City’s planning commission deny approval of the tentative map for the proposed subdivision. However, after two full commission hearings and one subcommittee hearing, the City’s planning commission approved the tentative map. Quail then appealed to the city council (Council), and a hearing was held on December 16, 1992. Although one Council member pronounced the subdivision “[is] going to be quite a change for the environment,” the Council approved the tentative map application for the proposed subdivision and specifically resolved: “In the independent judgment of the City Council, this project will not have a significant effect on the environment with incorporation of the mitigation measures set forth in the initial study from Brian F. Mooney Associates dated May 21, 1992, made conditions of approval hereunder, and a negative declaration is hereby certified, pursuant to the California Environmental Quality Act (CEQA).” The trial court denied Quail’s petition for writ of mandate relief.
II
The appropriate standard of review of the City’s action is disputed by the parties to this appeal. However, as we discuss below, the basic standard of *1601 review is fairly clear based upon the great weight of case law, although it must be carefully interpreted and applied to comply with CEQA’s intent.
In adopting CEQA, the Legislature in section 21001 declared it to be the policy of the State of California, in part, to:
“(a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.
“(b) Take all action necessary to provide the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise” (Italics added.) Section 21060.5 defines “environment” as “the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.” (Italics added.)
CEQA requires a governmental agency prepare an environmental impact report (EIR) whenever it considers approval of a proposed project that “may have a significant effect on the environment.” (§ 21100, italics added.) In addition to the intent to require governmental decision makers to consider the environmental implications of their decisions, the Legislature in enacting CEQA also intended to provide certain substantive measures for protection of the environment. (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 254-256 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on another point in Kowis v. Howard (1992) 3 Cal.4th 888, 896-899 [12 Cal.Rptr .2d 728, 838 P.2d 250]; Sierra Club v. Gilroy City Council (1990) 222 Cal.App.3d 30, 41 [271 Cal.Rptr. 393].) In particular, one court noted section 21002[2] requires public agencies “to deny approval of a project with significant adverse effects when feasible alternatives or feasible mitigation measures can substantially lessen such effects.” (Sierra Club v. Gilroy City Council, supra, 222 Cal.App.3d at p. 41.)
If there is no substantial evidence a project “may have a significant effect on the environment” or the initial study identifies potential significant *1602 effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. (§§ 21080, subd. (c), 21064.) However, the Supreme Court has recognized that CEQA requires the preparation of an EIR “whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.” (No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66]; see also Laurel Heights Improvement Assn. v. Regents of University of California (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) Thus, if substantial evidence in the record supports a “fair argument” significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified.
Upon a challenge of an agency’s decision no EIR is required, the reviewing court’s[3] “function is to determine whether substantial evidence supported the agency’s conclusion as to whether the prescribed ‘fair argument’ could be made.” (Friends of “B” Street v. City of Hayward (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514].) Restated, when the reviewing court: “perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency’s action is to be set aside because the agency abused its discretion by failing to proceed ‘in a manner required by law.’ ” (Ibid.) More recently, the First District Court of Appeal summarized this standard of review, stating: “A court reviewing an agency’s decision not to prepare an EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law. [Citation.] Stated another way, the question is one of law, i.e., ‘the sufficiency of the evidence to support a fair argument.’ [Citation.] Under this standard, deference to the agency’s determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. [Citation.]” (Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1317-1318 [8 Cal.Rptr.2d 473], italics added.) Thus, the applicable standard of review appears to involve a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard which usually results in great deference being given to the factual determinations of an agency. We agree with and adopt the First District’s Sierra Club standard of review as quoted above.
*1603 We decline to adopt the contrary minority view expressed in Newberry Springs Water Assn. v. County of San Bernardino (1984) 150 Cal.App.3d 740, 747-749 [198 Cal.Rptr. 100], in which the court ostensibly adopted the standard of review set forth in Friends of “B” Street v. City of Hayward, supra, 106 Cal.App.3d at page 1002, but proceeded to apply it in the forgiving, deferential manner typifying the substantial evidence standard. In any event, that case is inapposite and its deferential approach may be dicta, as the court concluded there was “no real evidence in the record, other than plaintiffs’ opinion” that a 900-cow dairy farm would have a significant effect on the environment. (Newberry Springs Water Assn. v. County of San Bernadino, supra, 150 Cal.App.3d at p. 749.) Further, that same court may have abandoned its deferential approach when it later restated the generally accepted standard of review and concluded, “. . . if it is clear that considerable evidence was presented and that the evidence was not properly considered by the lead agency the reviewing court may find an abuse of discretion.” (Citizens Assn, for Sensible Development of Bishop Area v. County of Inyo (1985) 172 Cal.App.3d 151, 173 [217 Cal.Rptr. 893].)
We further note our deferential approach taken in Uhler v. City of Encinitas (1991) 227 Cal.App.3d 795 [278 Cal.Rptr. 157], is inconsistent with the standard of review we apply in this case. In Uhler, we stated we may not substitute our judgment for that of the agency which certified a negative declaration, mistakenly applying the deferential substantial evidence standard of review. (Id. at pp. 802-803.) Accordingly, we candidly admit the Uhler standard of review cannot be reconciled with the correct standard of review we adopt in this case, and, as a result, we now abandon the erroneous standard we applied in Uhler.
In applying the appropriate standard, we must, of course, review the record and determine whether there is substantial evidence in support of a fair argument the subdivision may have a significant environmental impact, while giving the City the benefit of the doubt on any legitimate, disputed issues of credibility. In effect, we apply a hybrid, quasi-independent standard of review.
Ill
Applying this standard of review to our record, we note Quail asserts significant environmental impact may occur in four areas as a result of the proposed subdivision. It contends its panoramic ocean views, indigenous birds and wildlife, and tranquillity may be significantly impacted. Further, it contends the toxic pesticides in the subdivision’s soil may significantly affect its residents.
*1604 Based on our review of the administrative record, we conclude there is sufficient evidence of a possible environmental impact upon the Gardens’ views which supports a fair argument the subdivision, as proposed, may have a significant impact or effect on the environment. The City’s initial study performed with the assistance of Mooney concluded the subdivision could have significant environmental effects, but, through the implementation of proposed mitigation measures, the subdivision would not result in an overall adverse impact on the environment. In light of this initial study which addressed, among other things, the issue of view impact and in the course of the extensive lay and expert testimony and other evidence on the view issue during the hearings, the City effectively acknowledged the impact of the subdivision on the Gardens’ views could be a potential significant environmental impact. Further, the City does not dispute on appeal the effect of the subdivision on the Gardens’ views could raise an issue of significant impact under CEQA. Rather, it appears to contend any impact has been reduced below a level of significance by the imposition of mitigation measures which are a part of its negative declaration. Quail, however, asserts such mitigation measures do not clearly make view impacts insignificant, and substantial evidence supports a fair argument the subdivision, even with the mitigating measures, may have a significant impact on the Gardens’ views.
Appendix G to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) states in relevant part:
“A project will normally have a significant effect on the environment if it will:
“(b) Have a substantial, demonstrable negative aesthetic effect[.]”
Thus, the CEQA Guidelines essentially establish a rebuttable presumption any substantial, negative aesthetic effect is to be considered a significant environmental impact for CEQA purposes. We must give great weight to the CEQA Guidelines. (Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426,764 P.2d 278].) Lacking any reason to conclude otherwise, we adopt this provision of the CEQA Guidelines as self-evident. We further conclude it is inherent in the meaning of the word “aesthetic” that any substantial, negative effect of a project on view and other features of beauty could constitute a “significant” environmental impact under CEQA.
*1605 Extensive testimony and photographs in the record establish persons at the Gardens presently enjoy a panoramic view of the Pacific Ocean in a tranquil, beautiful setting. A dispute revolves, however, around whether it may be fairly argued the proposed subdivision may “significantly” impact or diminish such view and beauty. To the City’s and Beck’s credit, many changes were made to the proposed subdivision over the course of the hearings in an effort to reduce any such impact. Yet, we do not judge compliance based on how many changes were made from the original proposal, but rather on the status of the proposed subdivision at the time of approval by the City together with any specific mitigation measures adopted by the City at that time.[4] Both Beck and Quail presented photographs from many vantage points on the Gardens’ property overlooking the subdivision and Pacific Ocean, and we have reviewed these photographs. Many of these photographs reveal the location of various “story poles” Beck placed on the property to indicate the height of some of the proposed houses. Although more elaborate methods such as computerized three-dimensional imagery or more complete roof outlines may more accurately display the extent of view obstruction, even this rather simple method of using “story poles” reveals there is a definite probability of at least some view obstruction. However, the exact extent of obstruction is unclear and disputed by the parties. In addition to the lay testimony of Quail members and representatives of the County of San Diego Department of Parks and Recreation who indicated the subdivision would substantially impair the existing views and beauty of the Gardens, more probative evidence was introduced through the testimony of John Blake, an expert surveyor retained by Quail. Blake performed a number of survey measurements from various vantage points on the Gardens and testified, “it’s pretty clear that at least 60% of the view is going to be missing, maybe up to 90%.” More specifically, he identified two areas from which the view impacts will be the greatest, namely, the parking lot area and the Asian gardens area which are both adjacent to the proposed subdivision. *1606 It also seems self-evident that replacing existing greenhouses with many large two-story homes will have at least some adverse effect upon the Gardens’ views and the beauty of the setting.
Finally, we note the City’s mitigation measures do not clearly reduce such effects below a level of significance. The only specific mitigation measure adopted by the City at the time of approval regarding the height of the houses was set forth in the City’s resolution approving the tentative map, providing in relevant part:
“For purposes of this analysis, the threshold for determining a significant visual impact is assumed to be the maximum height of the ‘building envelope’ for proposed Lots #18-27. The maximum ‘building envelope’ shall be measured at approximately four feet above the crest of the adjoining grade of the Quail Gardens property adjacent to the eastern subject property boundary. This represents the typical eye level by which a person standing anywhere along the Quail Gardens parking lot would have ‘ocean views’ looking westerly. For example, the maximum ‘building envelope’ for proposed Lot #22, as viewed from the northwest comer of the adjacent Quail Gardens parking lot, is at an elevation of approximately 264 feet AMSL. Therefore, the roof ridgelines of future homes constructed on proposed Lots #18-27 shall not be allowed to project above the maximum ‘building envelope’, where significant view opportunities occur for visitors to the Quail Botanical Gardens, without specific authority through design review. . . .
“Future homes on Lots 19, 21, 22, 23, and 24 shall be limited to a maximum height of 22 ft. and future homes on Lots 18, 20, and 25 shall be limited to a maximum height of 24 ft. . . . [The City then sets forth specific building height limits for 13 adjacent lots.]” Thus, the basic height limitation is four feet above the adjacent Gardens level. Given the uncontradicted expert survey showing the adjacent parking area of the Gardens is typically about 260 feet above sea level, even a beginning geometry student can deduce that such a limitation would not prevent obstruction of the ocean view. In fact, for a child or disabled person in a wheelchair with a line of vision under a height of four feet, such a limitation would result in total obstruction of certain views of the ocean, leaving, at best, limited and amorphous “view corridors” which were not adequately identified or proven, either quantitatively or qualitatively, during the hearings.
Thus, based on the record before it, the City could not conclude its mitigation measures clearly would reduce the subdivision’s adverse view *1607 impacts below a level of significance. The record clearly shows Quail presented substantial evidence there may be a significant impact upon the Gardens’ views, and “contrary evidence is not adequate to support a decision to dispense with an EIR.” (Sierra Club v. County of Sonoma, supra, 6 Cal.App.4th at p. 1316.) The expert testimony of Blake indicated there would be a significant impact upon views and contradicted expert testimony presented by Beck. Accordingly, as one court stated, “. . . if there is a disagreement among experts over the significance of an effect, the agency is to treat the effect as significant and prepare an EIR." (Id. at p. 1317.)
Based upon our review of the reliable and largely undisputed evidence in the record before the City regarding potential impacts on views, we conclude there is substantial evidence supporting a fair argument the proposed subdivision, even with its specific mitigation measures, may significantly impact the environment. Accordingly, the City erred in certifying the mitigated negative declaration.[5]
Disposition
The judgment is reversed with directions to the trial court to enter a judgment granting the petition, to issue a peremptory writ of mandate directing the City to set aside its December 16, 1992, resolution certifying the negative declaration and approving the tentative subdivision map, and to issue such injunctive and other relief as may be appropriate and consistent with this opinion. Appellant to recover its costs of this appeal.
Froehlich, J„ concurred.

 All statutory references are to the Public Resources Code unless otherwise specified.

 Section 21002 provides: “The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof.”

 Our task on appeal is “the same as the trial court’s.” (Fund for Environmental Defense v. County of Orange (1988) 204 Cal.App.3d 1538, 1545 [252 Cal.Rptr. 79].) Thus, we conduct our review independent of the trial court’s findings.

 Although we need not decide the issue in light of our holding, we note the City cannot rely upon postapproval mitigation measures adopted during the subsequent design review process. Such measures will not validate a negative declaration. As one court stated, “There cannot be meaningful scrutiny of a mitigated negative declaration when the mitigation measures are not set forth at the time of project approval.” (Oro Fino Gold Mining Corp. v. County of El Dorado (1990) 225 Cal.App.3d 872, 884 [274 Cal.Rptr. 720]; see also Sundstrom v. County of Mendocino (1988) 202 Cal.App.3d 296, 306-307 [248 Cal.Rptr. 352] [holding such a procedure as contrary to law, because the “use permit contemplates that project plans may be revised to incorporate needed mitigation measures after the final adoption of the negative declaration.”].) Further, we note the CBQA Guidelines require project plans to be revised to include mitigation measures “before the proposed negative declaration is released for public review . . . .” (Cal. Code Regs., tit. 14, § 15070, subd. (b)(1).) Thus, any necessary mitigation measures must be specifically set forth at the time of publication of a mitigated negative declaration in advance of the City’s adoption of it. (§ 21092; Cal. Code Regs., tit. 14, § 15072, subd. (a).)

 In light of our holding, we need not address whether Quail’s remaining contentions may be potentially meritorious, namely that (i) indigenous birds and wildlife and tranquillity may be significantly impacted, (ii) toxic contamination is a significant effect on the environment, (iii) the City abused its discretion by failing to consider whether an EIR should be required, (iv) the City improperly deferred mitigation measures, (v) the City improperly prevented it from refuting Beck’s testimony regarding toxic contamination, and (vi) the court erred in excluding posthearing evidence. Quail Foundation’s entitlement to attorney fees under Code of Civil Procedure section 1021.5 and the amount thereof shall be addressed by the trial court on remand.