[No. D029489. Fourth Dist., Div. One. Nov. 18, 1998.]

PALA BAND OF MISSION INDIANS, Plaintiff and Appellant, v. COUNTY OF SAN DIEGO, Defendant and Respondent.

558

**COUNSEL**

Thomas D. Mauriello for Plaintiff and Appellant.

John J. Sansone, County Counsel, Diane Bardsley and Richard K. Denhalter, Chief Deputy County Counsel, and R. Mark Beesley, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**NARES, J.**—The Pala Band of Mission Indians (Pala) appeals a judgment denying its amended petition for peremptory writ of mandate in which Pala

sought to vacate a negative declaration certified by the County of San Diego (County) under the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) in connection with the County's adoption in September 1996 of a countywide integrated waste management plan (plan) mandated by the Integrated Waste Management Act of 1989 (the Waste Act) (§ 40000 et seq.) as a prerequisite for the development of new landfills in the County. As required by the Waste Act, the plan consists of (among other things) a countywide summary plan and a countywide landfill siting element.

The siting element describes and evaluates 10 "proposed" landfill sites that are only "tentatively reserved," including Gregory Canyon, an area near the Pala Indian Reservation. The siting element also states the City of San Diego "anticipates" it will develop a new landfill on one of the sites, and a second landfill might be developed at Gregory Canyon.

Pala appeals, contending the County's certification of the negative declaration was a prejudicial abuse of discretion because the siting element and Pala's comment letter regarding the negative declaration constitute substantial evidence supporting a fair argument that the County's approval of the summary plan and siting element may have a significant impact on the environment, thereby triggering under CEQA an obligation on the part of the County to prepare a type of environmental impact report (EIR) known as a "program" EIR.

We conclude there is no substantial evidence in the administrative record to support a fair argument that the County's adoption of the siting element may have a significant environmental impact, and thus the County did not prejudicially abuse its discretion by certifying the negative declaration. We further conclude that because all 10 of the proposed landfill sites identified in the siting element are only "tentatively reserved," preparation of an EIR (including a program EIR) would be premature and is not yet required under CEQA. Accordingly, we affirm the judgment denying Pala's amended petition.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Gregory Canyon and Proposition C*

Pala is a federally recognized Indian tribe located on the Pala Indian Reservation. The reservation is located near an area known as Gregory Canyon.

---

[1] Subsequent unattributed statutory references are to the Public Resources Code.

In 1994, County voters approved Proposition C, an initiative entitled the "Gregory Canyon Landfill and Recycling Collection Center Ordinance." Proposition C amended the County's general plan and zoning ordinance to designate Gregory Canyon for use as a privately owned solid waste facility.

The text of Proposition C stated that the intent of the initiative was (among other things) to "provide for the siting of a new recycling collection center and . . . solid waste landfill . . ."; to "ensure that the [collection center and landfill] . . . fully comply with all environmental laws and regulations . . ."; and to "provide that at least 1313 acres of the . . . site will be dedicated as permanent open space to create a substantial preservation area . . . ." The initiative also described a "solid waste crisis" in the County, resulting from "[l]ocal opposition to landfill sites and disagreement between north county cities and the County . . . over the handling of the solid waste system . . . ," and stated that the Gregory Canyon site was selected as one of the preferred landfill sites based on a 1987 study that evaluated 168 alternate sites.

B. *California Integrated Waste Management Act of 1989*

In 1989, in an attempt to more efficiently manage the disposal of solid waste in California, the Legislature enacted the Waste Act (§§ 40000, 40050 et seq.). The purpose of the Waste Act is to: "[R]educe, recycle, and reuse solid waste generated in the state to the maximum extent feasible in an efficient and cost-effective manner to conserve water, energy and other natural resources, to protect the environment, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and to specify the responsibilities of local governments to develop and implement integrated waste management programs." (§ 40052.)

The Waste Act requires every county in California to prepare a countywide integrated waste management plan, which must include (1) a summary of significant waste management problems facing the county and an overview of the specific steps that will be taken by local agencies to achieve the purposes of the Waste Act (§ 41751); and (2) four separate "elements"

(§ 41750), including a countywide landfill siting element (siting element) (*id.*, subd. (e)).[2]

### 1. *Siting element*

The Waste Act mandates that the siting element provide "a description of the areas to be used for development of adequate transformation or disposal capacity concurrent and consistent with the development and implementation of the county and city source reduction and recycling elements adopted pursuant to this part [part 2 of the Waste Act]." (§ 41700.)

Section 41701 governs the contents of the siting element, and provides in part that if a county determines that existing landfill capacity will be exhausted within 15 years or additional landfill capacity is desired, the siting element shall include (among other things) "[t]he identification of an area or areas for the location of new solid waste transformation or disposal facilities or the expansion of existing facilities which are *consistent* with the applicable city or county general plan." (§ 41701, subd. (d), italics added.)

### 2. *Siting criteria for landfill sites*

The statutory criteria which must be met for an area identified under section 41701, subdivision (d), to be "consistent" with an applicable general plan, are set forth in section 41702.[3] Under the regulations promulgated to implement the Waste Act, the siting element must include specified minimum criteria that are to be used in the siting process for each solid waste facility, including (among other things) a description of environmental

---

[2]The other three mandatory elements are: a source reduction and recycling element, a household hazardous waste element, and a nondisposal facility element. (§ 41750, subds. (a)-(d) and (f)-(g).)

[3]Section 41702 provides:

"An area is consistent with the city or county general plan if all of the following requirements are met:

"(a) The city or county adopted a general plan which complies with the requirements of Article 5 (commencing with Section 65300) of Chapter 3 of Division 1 of Title 7 of the Government Code.

"(b) The area reserved for a new solid waste facility or the expansion of an existing solid waste facility is located in, or coextensive with, a land use area designated or authorized for solid waste facilities in the applicable city or county general plan.

"(c) The land use authorized in the applicable city or county general plan adjacent to or near the area reserved for the establishment of new solid waste transformation or disposal of solid waste or expansion of existing facilities is compatible with the establishment or expansion of the solid waste facility."

considerations and environmental impacts. (Cal. Code Regs., tit. 14, § 18756, subd. (a).)[4]

The implementing regulations provide in part that the siting element "shall include a description of each proposed new solid waste disposal facility . . . which complies with the criteria identified in Section 18756 . . . ." (Cal. Code Regs., tit. 14, § 18756.1, subd. (a).) The regulations also provide that "[n]o solid waste disposal facility identified in the Siting Element shall be established that does not satisfy the minimum criteria that are adopted in the Siting Element pursuant to section 18756(a) [discussed *ante*] of this article." (*Id.*, § 18756, subd. (d).)

3. *"Reserved" versus "tentatively reserved" proposed solid waste facility areas*

The Waste Act and related implementing regulations permit a siting element to designate a proposed solid waste facility area identified under section 41701 (discussed *ante*) as either a "reserved" or "tentatively reserved" area. Section 41710, subdivision (a), provides in part that "[a] county may *tentatively reserve* an area . . . for the location of a new solid waste transformation or disposal facility . . . even though that reservation of the area . . . is not consistent with the applicable city or county general

---

[4]California Code of Regulations, title 14, section 18756, subdivision (a), provides:

"To establish a new solid waste disposal facility or to expand an existing solid waste disposal facility, the county and regional agency shall describe the criteria to be used in the siting process for each facility. The criteria shall include, but not be limited to, a description of the major categories of *Environmental Considerations, Environmental Impacts*, Socioeconomic Considerations, Legal Considerations, and additional criteria as developed by the county, cities, regional agency and member agencies. The following are examples of criteria that may be considered within those major categories:

"(1) *Environmental Considerations (for example: geology and solids including faulting and seismicity, ground settlement, surface hydrology and ground water, quantity and quality of ground water, surface water, surface water contamination, drainage patterns, etc.)*;

"(2) *Environmental Impacts (for example: air quality including climatic and meteorological conditions and emissions, visibility, cultural resources including regional setting, inventory and significance, paleontological resources including inventory and significance, vegetation, and wildlife, etc.)*;

"(3) Socioeconomic considerations (for example: transportation including local and regional transportation systems, highways and major roadway corridors, rail transportation and corridors, land use including regional and local land uses such as military use, mineral extraction, agriculture, recreation/tourism, compatibility with existing and future land uses, consistency with county general plan(s) and future post-closure uses, economic factors including estimates of development costs and operational costs, etc.);

"(4) Legal considerations (for example: federal, state, and local minimum standards and permits, liabilities, and monitoring, etc.);

"(5) Additional criteria as may be included by the county, cities, regional agency and member agencies approving the Siting Element." (Italics added.)

plan" (italics added). This statute further provides that "[a] *reserved* area in a countywide siting element is *tentative* until it is made consistent with the applicable city or county general plan." (*Ibid.*, italics added).

California Code of Regulations, title 14, section 18756.3, subdivision (a), provides in part that "[p]roposed areas that are consistent with the current city and county general plans shall be *reserved* pursuant to the requirements of Public Resources Code sections 41702[5] and 41720[6]" (italics added). Subdivision (b) of this regulation provides that proposed areas "may" be "tentatively reserved" if they are "not situated in, coextensive with, or adjacent to an area authorized for land use as a solid waste disposal facility," and "shall" be "tentatively reserved" if they are "inconsistent with applicable city and county general plans."[7] Finally, subdivision (c) of this regulation permits the proposed areas to be identified as "tentatively reserved" in the siting element of the initial filing of the countywide waste management plan; but further provides that by the first five-year revision of the plan all areas identified to assure the required minimum of fifteen years of combined permitted disposal capacity must be consistent with the applicable city or county general plan under the criteria set forth in section 41702[8] (discussed *ante*). (Cal. Code Regs., tit. 14, § 18756.3, subd. (c).)[9]

Furthermore, the Waste Act provides that a "tentatively reserved" area identified in a siting element must be removed from the siting element unless a finding is made that the area is consistent with the applicable general plan. Specifically, section 41711 provides that "[a]n area tentatively reserved for

---

[5]See footnote 3, *ante*.

[6]Section 41720 provides: "The countywide siting element submitted to the board, shall include a resolution from each affected city or the county stating that any areas identified for the location of a new or expanded solid waste transformation or disposal facility pursuant to Section 41701 is consistent with the applicable general plan."

[7]California Code of Regulations, title 14, section 18756.3, subdivision (b), provides: "Proposed areas that are not situated in, coextensive with, or adjacent to an area authorized for land use as a solid waste disposal facility, within an applicable city and county general plan, may be '*tentatively reserved*' for future or expanded solid waste disposal facilities. Proposed areas that are inconsistent with applicable city and county general plans shall be *tentatively reserved* pursuant to the requirements of Public Resources Code sections 41710 through 41712." (Italics added.)

[8]See footnote 3, *ante*.

[9]California Code of Regulations, title 14, section 18756.3, subdivision (c), provides: "Proposed areas included in the Siting Element may be identified as '*tentatively reserved*' in the initial filing of a Countywide and Regionwide Integrated Waste Management Plan, as determined by Public Resources Code section 41791. However, by the first five-year revision of the Countywide and Regionwide Integrated Waste Management Plan all areas identified to assure the minimum of 15 years of combined permitted disposal capacity as described in CCR 18755(a) of this article must meet the requirements of Public Resources Code section 41702." (Italics added.)

the establishment or expansion of a solid waste transformation or disposal facility shall be removed from the countywide siting element if a city or county fails or has failed to make the finding that the area is consistent with the general plan or has made a finding that the area should not be used for the location of a solid waste transformation or disposal facility."

Thus, under the Waste Act and implementing regulations, proposed solid waste facility areas that are designated as "tentatively reserved" in the siting element in the initial filing of the plan must be made consistent with the applicable general plans under the criteria set forth in section 41702, and actually reserved under the requirements set forth in sections 41702 and 41720, by the time of the first five-year revision of the plan.

### C. The County's siting element

In compliance with the Waste Act, the County prepared a summary plan and siting element.[10] In 1995, the County circulated the drafts for public review and comment, and received comments from 15 entities. Pala did not submit a comment.

In February 1996, following the comment period, the County revised the siting element and issued the final draft summary plan and siting element. The stated goals purportedly pursued in the development of the siting element included (among others) the reduction of the amount of waste disposed in landfills through source reduction, recycling and composting, and the identification of "disposal facilities or strategies, including export to out-of-county facilities, necessary to dispose of the solid waste generated by the jurisdictions of the county for a minimum of 15 years."

The siting element[11] analyzes the amount of landfill solid waste disposal capacity needed to serve the various jurisdictions in the County for the next 15 years, and describes and provides location maps of each existing solid waste disposal facility in the County. It also sets forth the siting criteria to be applied in the selection of new solid waste disposal facility sites, including eight "pass/fail" siting criteria to be used in the initial phase of a siting

---

[10]The County had prepared and adopted the other elements required by the Waste Act (see fn. 2, *ante*) that are not challenged here.

[11]Because the final draft siting element was approved by the County without further revision (as we shall discuss, *post*), we here discuss the contents of the siting element in its approved form.

study,[12] and twenty "evaluation" siting criteria to be used in evaluating the sites that remain following the initial screening under the "pass/fail" criteria in the initial study.

### 1. *Statement that the city "anticipates" it will develop a new landfill at one of the "tentatively reserved" sites*

Of particular significance to the issues raised in this appeal, chapter 6 of the siting element states that the City of San Diego "anticipates" it will develop a new landfill, as follows: "It is anticipated that the City of San Diego will develop a new landfill during the planning period. This will be for disposal of the City's municipal solid waste. The site will be one of several under consideration as this Siting Element is being developed. The potential site descriptions and locations for this landfill are listed in Chapter 7 as 'tentatively reserved' sites."

### 2. *Reference to Gregory Canyon*

The siting element suggests that although potential sites have been identified in North and South County, these sites may not be developed: "The County has also identified potential sites for landfill development in both the North and South County regions. However, a landfill will not be developed in either of these regions unless waste generation and disposal volumes warrant it. [¶] At the present time the capacity of existing landfills along with that of the City of San Diego's planned new landfill will provide disposal capacity for all waste generated within the County beyond the planning period." (Fn. omitted.)

The siting element refers to Gregory Canyon and the passage of Proposition C in a footnote, which states in part: "In a voter initiative on November 8, 1994, Gregory Canyon was approved by the voters of San Diego County as a possible landfill site. This initiative is currently subject to legal challenge.[13] If a landfill is developed, additional disposal capacity will be available in the region."

---

[12]The siting element states that "[i]f a candidate site doesn't pass the eight Pass/Fail [Siting] Criteria in the initial phase of a siting study, it will be dropped from further consideration." Although the eight "pass/fail" siting criteria are not directly at issue in this appeal, and thus we do not discuss them in any detail, we note the general headings listed for these criteria in the siting element are: "Proximity to Airports"; "Floodplain"; "Active Faults"; "Incompatible Land Use"; "Threatened or Endangered Species"; "Historic and Archaeological Preservation"; "Aquifers"; and "Distance from [M]ajor [A]queduct."

[13]See our prior decision in *Pala Band of Missions Indians* v. *Board of Supervisors* (1997) 54 Cal.App.4th 565 [63 Cal.Rptr.2d 148] in which we affirmed a judgment denying Pala's petition for a writ of mandate challenging the validity of Proposition C on various grounds,

### 3. *The 10 "tentatively reserved" sites*

In chapter 7 (titled "Tentatively Reserved Disposal Sites"), the siting element identifies 10 "potential landfill sites,"[14] including Gregory Canyon, and states that "[t]hese sites are tentatively reserved." The siting element also asserts that these sites "are currently being studied to assure 15 years of combined permitted countywide disposal capacity"; the sites must be consistent with general plans; California Code of Regulations, title 14, section 18756.3, subdivision (a), "requires that a resolution, notarized statement or affidavit, regarding land use consistency of any 'reserved' area be obtained from each affected jurisdiction and included in the Siting Element"; and "[a]t the present time there are **no areas** in the San Diego County designated as '**reserved**' for landfill or transformation facilities" (italics added, original bolding and underlining).

Chapter 7 of the siting element further states that the element "may identify facility locations that are not consistent with applicable general plans," but "[u]ltimately all sites selected must be consistent with applicable general plans as of the first five year revision of the Countywide Integrated Waste Management Plan, or be removed from the Plan at that time if they are found to still be inconsistent with the applicable general plans."

The siting element thus clearly indicates the 10 "tentatively reserved" sites identified as "potential landfill sites" have not been designated as "reserved" sites. Although the siting element asserts "[t]he City of San Diego expects to develop a landfill within the planning period on one of its tentative sites," it also states that "[a]ctual development of any of these sites will be conditioned on waste generation trends, need, economic feasibility and environmental constraints."

### D. *The negative declaration*

The County Department of Public Works prepared an initial study under CEQA to examine (among other things) the potential environmental impacts of the County's adoption of the plan (which, as we have discussed, included

---

but concluded that a severable provision naming a private entity as the "applicant," and providing that entity with certain powers and functions, violated article II, section 12, of the California Constitution and thus was void.

[14]The 10 sites are: Oak Canyon (City of San Diego); Spring Canyon (City of San Diego); Oak/Spring Canyons combined site (City of San Diego); Upper Sycamore Canyon (City of San Diego); Aspen Road (County); Merriam Mountain South (County); *Gregory Canyon* (Private/County); Wolf Canyon (County); North Otay Valley (County); and East Otay Mesa (County).

the summary plan and siting element), and to determine whether an EIR was required. The initial study concluded there was no substantial evidence that adoption of the plan may have a significant effect on the environment, and recommended that a negative declaration be prepared. The department of public works drafted a negative declaration that was issued with the initial study.

In support of its conclusion that an EIR was not required in connection with the adoption of the plan, the initial study noted that the plan is a "comprehensive planning document," and its adoption "does not cause a specific new development project to be undertaken." The initial study also stated that additional environmental review will be conducted "in association with development of the respective landfills": "All environmental issues will be analyzed in environmental reports or other appropriate environmental documents prepared in association with development of the respective landfills. The additional environmental review will be conducted in association with any new facility, the expansion of existing facilities, and establishment of new programs."

The negative declaration was circulated for public review. Four entities, including Pala, submitted letters of comment.

1. *Pala's comment letter*

Pala's four-page letter of comment, which was submitted by Pala's general counsel, consisted almost exclusively of various arguments supporting counsel's opinion that CEQA required the preparation of an EIR in connection with approval of the plan. Among other things, the letter asserted that the initial study ignored "considerable" (but unspecified) "documentation of the potential secondary effects of adopting this Plan"; the County was required to "prepare a new analysis commensurate with the information available on each site and on the development of each site, identify mitigation measures, and prepare an [EIR] to address such matters"; the "inclusion of a landfill site in the Landfill Siting Element is the first step in the approval process of that landfill"; and the initial study "improperly defers any meaningful analysis until the project approval stage for each landfill."

Pala's comment letter also asserted that the initial study ignored an unspecified "substantial body of information available from the County Public Works and Environmental Health Departments files, and information provided to your staff by the Pala Band," and requested that the County prepare a new initial study to identify (among other things) the "potential effects of developing the landfill sites included in the Siting Element" and

"[p]rogram-level mitigation measures . . . for incorporation in any project level environmental reviews which may follow for specific landfill projects."

The comment letter referred to the County's May 1995 "Notice of Preparation of an Environmental Impact Report for the Gregory Canyon Landfill & Recycling Center," a copy of which was attached to the letter. This notice of preparation described the main features of the proposed solid waste landfill at Gregory Canyon.

### 2. County's response to Pala's comment letter

The County responded in writing to Pala's comment letter, stating that the plan is a "comprehensive planning document"; the siting element "serves as a policy manual, rather than a specific development program"; and adoption of the plan "does not cause a specific new development project to be undertaken." The response also asserted that "[a]ny environmental analysis of tentatively reserved disposal sites in the Siting Element would be speculative"; "[a]ll environmental issues will be analyzed in environmental impact reports or appropriate environmental documents prepared in association with development of the respective landfills"; and "[e]ach site will be assessed and evaluated at the time when a specific project site has been determined to be needed to fulfill community needs."

### 3. County's approval of the negative declaration

In September 1996, the County Board of Supervisors (Board) considered the siting element and negative declaration. Only one member of the public requested to speak, and Pala did not appear. Following the hearing, the Board adopted a resolution and notice of determination approving the summary plan, siting element, and negative declaration.

### E. Trial court's denial of Pala's amended petition

In October 1996, Pala challenged the negative declaration by filing an amended petition for peremptory writ of mandate in superior court. Pala alleged the County had violated CEQA by approving the summary plan and siting element without preparing an EIR.

The court issued a tentative ruling denying the petition. The court reasoned that the plan only designated Gregory Canyon as one of 10 potential sites for a proposed landfill, and thus it would be both premature and unnecessary to require the preparation of an EIR. The court also stated "[i]f this site is ultimately *reserved* for development as a landfill then CEQA

protects [Pala] because it will require an EIR which will study environmental impacts, including alternative sites."

Following oral argument, the court confirmed the tentative ruling and entered judgment denying Pala's amended petition. Pala's timely appeal followed.

## CEQA OVERVIEW AND STANDARD OF REVIEW

■ The California Supreme Court in *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 563-564 [276 Cal.Rptr. 410, 801 P.2d 1161], summarized the purposes of CEQA:

"As we recently observed in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights* [*I*]): 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' (*Id.* at p. 390, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ "The EIR has been aptly described as the 'heart of CEQA.' (Guidelines, § 15003, subd. (a); *Laurel Heights* [*I*], *supra*, 47 Cal.3d at p. 392; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights* [*I*], *supra*, 47 Cal.3d at p. 392.) [Fn. omitted.]" (52 Cal.3d at pp. 563-564).

In *Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas* (1994) 29 Cal.App.4th 1597 [35 Cal.Rptr.2d 470] (*Quail Botanical Gardens*), we explained the principles that guide our review of an agency's determination that an EIR is not required for a particular project, as follows:

"CEQA requires a governmental agency [to] prepare an [EIR] whenever it considers approval of a proposed project that '*may* have a *significant* effect on the environment.' (§ 21100, italics added.) In addition to the intent to require governmental decision makers to consider the environmental implications of their decisions, the Legislature in enacting CEQA also intended to provide certain substantive measures for protection of the environment [Citations.] . . .

■ "If there is no substantial evidence a project 'may have a significant effect on the environment' or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. (§§ 21080, subd. (c), 21064.) However, the Supreme Court has recognized that CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.] Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified.

■ "Upon a challenge of an agency's decision no EIR is required, the reviewing court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.' [Citation.] Restated, when the reviewing court: 'perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed "in a manner required by law." ' (*Ibid.*) More recently, the First District Court of Appeal summarized this standard of review, stating: 'A court reviewing an agency's decision not to prepare an EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law. [Citation.] Stated another way, the question is one of law, i.e., "the sufficiency of the evidence to support a fair argument." [Citation.] Under this standard, *deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary.* [Citation.]' (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317-1318 [8 Cal.Rptr.2d 473], italics added.) Thus, the applicable standard of review appears to involve a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard which usually results in great deference being given to the factual determinations of an agency. We agree with and adopt the First District's *Sierra Club* standard of review as quoted above." (*Quail Botanical Gardens, supra,* 29 Cal.App.4th at pp. 1601-1602, fn. omitted.)

In a footnote, we further explained in *Quail Botanical Gardens* that "[o]ur task on appeal is 'the same as the trial court's.' (*Fund for Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538, 1545 [252 Cal.Rptr. 79].) Thus, we conduct our review independent of the trial court's

findings." (*Quail Botanical Gardens, supra*, 29 Cal.App.4th at p. 1602, fn. 3.)

With these principles in mind, we now review the County's determination that its adoption of the siting element did not require the preparation of an EIR under CEQA.

## DISCUSSION

 Pala contends the County's certification of the negative declaration was a prejudicial abuse of discretion because the siting element adopted by County and Pala's comment letter regarding the negative declaration constitute substantial evidence supporting a fair argument the County's approval of the summary plan and siting element may have a significant impact on the environment, thereby triggering under CEQA an obligation on the part of the County to prepare a type of EIR known as a "program" EIR. We disagree and conclude the County properly certified the negative declaration.

### A. *Tiering and Program EIR's*

In order to properly discuss the merits of Pala's challenge to the negative declaration at issue here, we must preliminarily address the concept of a "program" EIR. However, to properly understand the nature of a "program" EIR, we must first discuss the related concept of EIR "tiering."

"Tiering" is defined in section 21068.5: " 'Tiering' or 'tier' means the coverage of general matters and environmental effects in an [EIR] prepared for a policy, *plan*, program or ordinance followed by narrower or site-specific [EIR's] which incorporate by reference the discussion in any prior [EIR] and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior [EIR]." (Italics added.) ██ ██ (See also CEQA Guidelines,[15] § 15385.[16])

---

[15]All subsequent references to "Guidelines" are to the state CEQA Guidelines, which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

In *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1123, footnote 4 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*), the Supreme Court stated, "This court has yet to decide whether the Guidelines are regulatory mandates or merely aids to interpretation. We need not decide this issue in this case. We, however, have recognized that, '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' (*Laurel Heights I, supra*, 47 Cal.3d at p. 391, fn. 2; accord, *Goleta Valley II, supra*, 52 Cal.3d at p. 564, fn. 3.)"

[16]Section 15385 of the Guidelines provides: " 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general

The Legislature has declared that the purpose of tiering is to "promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive [EIR's], and (3) ensuring that [EIR's] prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project." (§ 21093, subd. (a).) The Legislature has further determined that "tiering is appropriate when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous [EIR's]." (*Ibid.*)

The Legislature has also declared that to achieve the purpose of tiering as set forth in subdivision (a) of section 21093, "[EIR's] shall be tiered whenever feasible, as determined by the lead agency." (§ 21093, subd. (b).)

■ The program EIR is one form of a tiered EIR. (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618] (*Al Larson Boat Shop*).) The program EIR is provided for in the Guidelines, but not in the Public Resources Code. (*Ibid.*)

Section 15168 of the Guidelines governs program EIR's, and defines a program EIR as "an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168, subd. (a).) "A program EIR as provided for in the Guidelines is an *optional* procedure to review in one document a 'series of actions that can be characterized as one large project[.]' [Citation.]" (*Al Larson Boat Shop, supra,* 18 Cal.App.4th at p. 741.)

---

discussions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRs is:

"(a) From a general plan, policy, or program EIR to a program, plan, or policy EIR of lesser scope or to a site-specific EIR;

"(b) From an EIR on a specific action at an early stage to a subsequent EIR or a supplement to an EIR at a later stage. Tiering in such cases is appropriate when it helps the Lead Agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

### B. *The County's certification of the negative declaration was proper*

The issue we must decide here is whether the County properly certified the negative declaration in connection with its adoption of the summary plan and siting element. As we have discussed, an agency's certification of a negative declaration is proper under the applicable "fair argument" standard if there is no substantial evidence in the administrative record to support a fair argument that the project in question may have a significant effect on the environment. (*Laurel Heights II, supra*, 6 Cal.4th at p. 1123; *Quail Botanical Gardens, supra*, 29 Cal.App.4th at pp. 1601, 1602.)

The issue presented thus resolves into the question of whether there is substantial evidence in the administrative record to support a fair argument that the County's adoption of the siting element may have a significant effect on the environment. We conclude there is no such substantial evidence.

### 1. *Siting element*

Pala contends the siting element itself constitutes the requisite substantial evidence under the applicable CEQA "fair argument" standard (discussed *ante*, at p. 571). Specifically, Pala relies primarily on the portion of chapter 6 of the siting element that states the City of San Diego "anticipates" it will develop a new landfill: "*It is anticipated that the City of San Diego will develop a new landfill during the planning period.* This will be for disposal of the City's municipal solid waste. The site will be one of several under consideration as this Siting Element is being developed. *The potential site descriptions and locations for this landfill are listed in Chapter 7 as 'tentatively reserved' sites.*" (Italics added.) As this excerpt demonstrates, the siting element lists various "potential" sites for this "anticipated" city landfill, and refers to those sites as "tentatively reserved" sites.

Pala also contends the siting element constitutes the requisite substantial evidence under the "fair argument" standard because the element states that a second landfill may be developed at the Gregory Canyon site. Specifically, Pala relies on a footnote in chapter 6 of the siting element, which states: "In a voter initiative on November 8, 1994, Gregory Canyon was approved by the voters of San Diego County as a possible landfill site. This initiative is currently subject to legal challenge. If a landfill is developed, additional disposal capacity will be available in the region."

We reject Pala's contentions. As we have discussed,[17] the Waste Act and related implementing regulations permit a siting element to designate a proposed solid waste facility area as either a "reserved" or "tentatively reserved" area. (See, e.g., § 41710, and Cal. Code Regs., tit. 14, § 18756.3.) As we have also discussed, however, proposed solid waste facility areas that are designated as "tentatively reserved" in the siting element in the initial filing of a plan must be made consistent with the applicable general plans under the criteria set forth in section 41702, and actually reserved under the requirements set forth in sections 41702[18] and 41720,[19] by the time of the first five-year revision of the plan. (§ 41711.)[20] The two methods authorized by statute for the removal of tentatively reserved areas from the siting element are set forth in section 41712.[21]

Here, it is undisputed that all 10 of the proposed landfill sites identified in the County's siting element are designated only as "tentatively reserved" areas. Chapter 7 of the siting element (titled "Tentatively Reserved Disposal Sites") expressly states that "[a]t *the present time there are* **no areas** *in the San Diego County designated as* **'reserved'** *for landfill or transformation facilities*" (italics added, original bolding and underlining). After identifying the 10 sites, chapter 7 of the siting element states that "[t]hese sites are tentatively reserved."

Because the proposed potential landfill sites identified in the siting element are only "tentatively reserved," there is nothing in the administrative record to establish it is reasonably foreseeable at the current planning stage that any of the sites will actually be developed. The siting element suggests that although potential sites have been identified in North and South County, these sites may not be developed: "The County has also identified potential sites for landfill development in both the North and South County regions. However, a landfill will not be developed in either of these regions unless

---

[17]See part B.3 of the "Factual and Procedural Background" section of this opinion, *ante.*

[18]See footnote 3, *ante.*

[19]See footnote 6, *ante.*

[20]Section 41711 provides: "An area tentatively reserved for the establishment or expansion of a solid waste transformation or disposal facility shall be removed from the countywide siting element if a city or county fails or has failed to make the finding that the area is consistent with the general plan or has made a finding that the area should not be used for the location of a solid waste transformation or disposal facility."

[21]Section 41712 provides:

"The removal of a tentatively reserved area from the countywide siting element, pursuant to Section 41711, shall be accomplished by either one of the following methods:

"(a) The county shall remove the area at the time of the next revision of the siting element.

"(b) The local agency having jurisdiction over the area shall request the county to remove the designation at the time of the next revision of the siting element."

The provisions of section 41711 are set forth in footnote 20, *ante.*

waste generation and disposal volumes warrant it. [¶] At the present time the capacity of existing landfills along with that of the City of San Diego's planned new landfill will provide disposal capacity for all waste generated within the County beyond the planning period." (Fn. omitted.) In our view, preparation of an EIR (including a program EIR) at the current planning stage would be premature in that any analysis of potential environmental impacts would be wholly speculative.[22]

None of the cases on which Pala relies require a different conclusion. Citing *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 243 [227 Cal.Rptr. 899] (*City of Carmel-by-the-Sea*), Pala contends the County was required under CEQA to prepare a program EIR prior to its adoption of the siting element, because the siting element " 'cause[s]' a new development project, in the sense that it is both a prerequisite for *and* the first significant step toward development of at least one new landfill." We disagree.

The *City of Carmel-by-the-Sea* case is distinguishable on its facts because it involved a county's rezoning decision that represented an actual commitment to expanded use of the property in question. (*City of Carmel-by-the-Sea, supra,* 183 Cal.App.3d at p. 244.) Here, in contrast, there is no substantial evidence in the administrative record to show that the County has made an equivalent "commitment" to develop any of the 10 "tentatively reserved" sites identified in the siting element. We are persuaded that under the governing provisions of the Waste Act and the implementing regulations (discussed *ante*), a commitment to develop one or more of the "tentatively reserved" sites identified in the siting element can arise only when a given site is designated as "reserved" upon a finding by the County that the site is consistent with the applicable general plan within the meaning of sections 41702 and 41720, and California Code of Regulations, title 14, section 18756.3[23] (discussed *ante*).

Pala's reliance on *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351 [7 Cal.Rptr.2d 307] (*Rio Vista*) is also misplaced. The *Rio Vista* case involved a challenge to the legal sufficiency of a "first-tier" program EIR certified by a county in connection with its adoption of a hazardous waste management plan required under the Tanner Act (Health & Saf. Code, §§ 25135 et seq., 25199 et seq.). (*Rio Vista, supra,* at pp. 362-363, 371; see also the discussion of *Rio Vista* in Remy et al., Guide

---

[22]We agree with the court's finding that "[t]o require an EIR at this time would be both premature and unnecessary."

[23]See part B.3 of the "Factual and Procedural Background" section of this opinion, *ante*.

to the California Environmental Quality Act (CEQA) (9th ed. 1996) p. 334.) The appellate court in *Rio Vista* upheld the certification of the EIR, rejecting the petitioners' central contentions that (1) the hazardous waste management plan effectively designated a specific area known as Montezuma Hills as one of the few regions which satisfied the siting criteria for hazardous waste facilities (*Rio Vista, supra,* 5 Cal.App.4th at p. 367); and (2) the EIR did not comply with CEQA requirements because the description of the project in the EIR was vague and uncertain (*id.* at pp. 369-373), and the EIR failed to contain adequate findings on the environmental impacts of locating a hazardous waste facility in the Montezuma Hills area, and on mitigation measures and alternatives (*id.* at pp. 373-379).

Pala's reliance on *Rio Vista* is misplaced because the issue presented in that case was the adequacy of the program EIR approved in that matter. *Rio Vista* did not involve the issue of whether CEQA required the preparation of a program EIR.

Pala's reliance on *Rio Vista* is also misplaced to the extent it cites that decision to support its contention that the County was required to prepare a program EIR to analyze the "particular types of environmental impacts resulting from the potential landfill locations identified in the Siting Element." The *Rio Vista* court rejected a similar contention. Noting that no specific hazardous waste facility had been proposed in that case, and that the county had not committed to a definite course of action by adopting the subject hazardous waste management plan, the court in *Rio Vista* concluded the program EIR "properly defer[red] more specific environmental reviews—presumably in the nature of project EIRs—until such facilities, if any, are actually proposed." (*Rio Vista, supra,* 5 Cal.App.4th at p. 375.) The Court of Appeal explained: ■ *"Where, as here, an EIR cannot provide meaningful information about a speculative future project, deferral of an environmental assessment does not violate CEQA.* [Citations.] The County has not impermissibly approved a project which envisions future action without future environmental review. [Citations.] Instead, the [final EIR] properly commits the County to future EIR's in the event a specific facility is proposed. [Citation.] . . ." (*Id.* at p. 373.) The *Rio Vista* court cited *Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748 [272 Cal.Rptr. 83], for the proposition that " '[s]peculative possibilities are not substantial evidence of environmental impact.' " (*Rio Vista, supra,* 5 Cal.App.4th at p. 375.)

■ Here, as in *Rio Vista*, the "[t]he County has not impermissibly approved a project which envisions future action without future environmental review." (*Rio Vista, supra,* 5 Cal.App.4th at p. 373.) The siting element at

issue here states in chapter 6 under the heading "Further Review Process": "The inclusion of a proposed facility in this Element does not substitute for any required review process nor does it guarantee approval of the facility. Each facility is considered individually through the local jurisdiction's land use permitting process, which requires environmental review in accordance with [CEQA]."

Pala also relies on *Al Larson Boat Shop, supra,* 18 Cal.App.4th 729, which involved a challenge to the sufficiency of a final "tiered" EIR for an amendment to a port master plan that contained a five-year plan to increase port cargo handling capacity by means of six "anticipated" projects, including three minor landfills. (*Id.* at pp. 736, 742.) However, *Al Larson Boat Shop*, like *Rio Vista*, did not address the issue of whether an EIR was required.

The decision in *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013 [192 Cal.Rptr. 325], which Pala also cites, is inapposite because the central issue presented was the standard of review to be applied by a trial court under CEQA when examining clear errors in the environmental review process that in turn lead to EIR deficiencies. (*Id.* at p. 1017.)

Pala correctly cites *Leonoff* v. *Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1346 [272 Cal.Rptr. 372], for the proposition that CEQA contemplates evaluation of environmental consequences of a project " 'at the earliest possible stage, even though more detailed environmental review may be necessary later.' [Citations.]" However, for reasons we have discussed, we conclude that because all 10 of the proposed landfill sites identified in the siting element are only "tentatively reserved," preparation of an EIR (including a program EIR) would be premature and is not yet required under CEQA.

### 2. *Pala's comment letter*

In its reply brief, Pala also contends its letter of comment, which its general counsel submitted in response to the draft negative declaration, constitutes substantial evidence supporting a fair argument that the County's approval of the siting element may have a significant impact on the environment. We disagree.

As we have discussed, Pala and three other entities submitted letters of comment in response to the County's circulation of the draft negative declaration for public review. As we have also discussed, Pala's four-page comment letter consists almost exclusively of various arguments supporting

its counsel's opinion that CEQA required the preparation of an EIR prior to the County's adoption of the siting element.

■ Section 15384, subdivision (a), of the Guidelines sets forth the definition of "substantial evidence," as follows: " 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. *Argument, speculation, unsubstantiated opinion or narrative,* evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment *does not constitute substantial evidence.*" (Italics added.) Subdivision (b) of section 15384 of the Guidelines provides that "[s]ubstantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."

■ Here, Pala's comment letter asserts that the County's CEQA initial study, which recommended approval of the negative declaration, ignored "considerable" (but unspecified) "documentation of the potential secondary effects of adopting this Plan"; the County was required to "prepare a new analysis commensurate with the information available on each site and on the development of each site, identify mitigation measures, and prepare an [EIR] to address such matters"; the "inclusion of a landfill site in the Landfill Siting Element is the first step in the approval process of that landfill"; and the initial study "improperly defers any meaningful analysis until the project approval stage for each landfill."

Pala's comment letter also asserts the initial study ignored an unspecified "substantial body of information available from the County Public Works and Environmental Health Departments files, and information provided to your staff by the Pala Band," and requested that the County prepare a new initial study to identify (among other things) the "potential effects of developing the landfill sites included in the Siting Element" and "[p]rogram-level mitigation measures . . . for incorporation in any project level environmental reviews which may follow for specific landfill projects."

The comment letter refers to the County's May 1995 "Notice of Preparation of an Environmental Impact Report for the Gregory Canyon Landfill & Recycling Center" (Notice of Preparation), a copy of which is attached to the letter. This Notice of Preparation describes (among other things) the main features of the proposed solid waste landfill at Gregory Canyon.

We conclude Pala's comment letter does not constitute substantial evidence under the applicable "fair argument" standard because it consists almost exclusively of mere argument and unsubstantiated opinion, which are excluded from the definition of substantial evidence under CEQA. (Guidelines, § 15384, subd. (a).) Even were the reference to the Notice of Preparation sufficient to meet the definition of "substantial evidence," Pala's comment letter would still be insufficient to trigger the EIR requirement under the "fair argument" test because (for reasons we have already discussed) all 10 potential landfill sites identified in the siting element are designated as "tentatively reserved," the County has made no commitment to develop any of the sites (including Gregory Canyon), and thus preparation of an EIR, including a program EIR, is not required under CEQA at this planning stage.

## C. Conclusion

We conclude there is no substantial evidence in the administrative record to support a fair argument that the County's adoption of the summary plan and siting element may have a significant environmental impact, and thus the County did not prejudicially abuse its discretion by certifying the negative declaration. We further conclude that because all 10 of the proposed landfill sites identified in the siting element are only "tentatively reserved," preparation of an EIR (including a program EIR) would be premature and is not yet required under CEQA.

### DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

Huffman, Acting P. J., and May, J.,* concurred.

A petition for a rehearing was denied December 9, 1998, and appellant's petition for review by the Supreme Court was denied February 17, 1999.

---

*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.